2025 IL App (2d) 240047-U
No. 2-24-0047
Order filed July 21, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 01-CF-363 |
| KENNETH E. SMITH, | ) ) ) | Honorable James S. Cowlin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court did not err in denying defendant's petition for a certificate of innocence. Affirmed.

¶ 2    Following a third jury trial, defendant, Kenneth E. Smith, was convicted of two counts of first degree murder (720 ILCS 5/9-1(a)(2), (3) (West 2002)) and one count of attempted armed robbery (720 ILCS 5/8-4(a), 18-2(a)(2) (West 2002)). He was sentenced to 67 years' imprisonment for first degree murder (including a 25-year enhancement for personally discharging a firearm) and a concurrent 7 years' imprisonment for attempted armed robbery. This court affirmed. *People v. Smith*, 2013 IL App (2d) 120508-U. Defendant subsequently petitioned in

federal court for a writ of *habeas corpus* (28 U.S.C. § 2254(d) (2018)), and the district court held that the evidence was sufficient to sustain defendant's convictions but that evidentiary errors warranted granting his petition, and it ordered the State to either initiate proceedings to retry defendant within 120 days or release him from custody immediately. *Smith v. Brookhart*, 2020 WL 1157356, *33 (N.D. Ill. Mar. 10, 2020). On appeal, the Seventh Circuit reversed the district court, holding that this court erred in concluding that the evidence was sufficient to support defendant's convictions, and it ordered an unconditional issuance of the writ and remanded for the granting of defendant's petition unconditionally and with instructions to immediately release defendant from State custody. *Smith v. Brookhart*, 996 F.3d 402, 417, 420 (7th Cir. 2021). Defendant then petitioned in the circuit court for a certificate of innocence under section 2-702 of the Code of Civil Procedure (Code) (735 ILCS 5/2-702 (West 2022)), and the court denied his petition. Defendant appeals, arguing that the circuit court: (1) based its decision on an incorrect understanding of material facts; and (2) erred by ignoring overwhelming additional evidence of his innocence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4       On March 6, 2001, two masked men attempted to rob the Burrito Express restaurant in McHenry. One of the men shot and killed Raul Briseno, the restaurant's owner. In May 2001, defendant (age 25), Justin Houghtaling (19), Jennifer McMullan (19 and defendant's girlfriend), and David Collett (18) were arrested. Houghtaling was arrested in Omaha, Nebraska, and gave a statement implicating himself and defendant. Based on this statement, the State indicted defendant. Houghtaling pleaded guilty in November 2001 and was sentenced to 20 years' imprisonment in exchange for his testimony against the others. Collett also pleaded guilty (in an *Alford* plea) to attempt armed robbery and received a five-year sentence. Following a trial that

included Houghtaling's testimony, McMullan was convicted of first degree murder and attempt armed robbery and sentenced to 27 years' imprisonment.

¶ 5                                    A. First Trial - 2003

¶ 6     Defendant's first jury trial occurred in 2003.  The State called Houghtaling, who invoked his fifth amendment right against self-incrimination (U.S. Const., amend. V; Ill. Const.1970, art. I, § 10) and refused to testify.  The trial court declared Houghtaling unavailable and allowed the State to present Houghtaling's testimony from McMullan's trial (implicating himself and defendant in the crimes).  Defendant was convicted of first degree murder and attempted armed robbery and was also found to have personally discharged the firearm that proximately caused Briseno's death.  He was sentenced to concurrent terms of 67 and 12 years' imprisonment, respectively.  On appeal, this court reversed and remanded for a new trial, holding that, under the subsequently-issued opinion in *Crawford v. Washington*, 541 U.S. 36, 53, 54 (2004), Houghtaling's prior statements were testimonial and admitted in violation of defendant's right to confront witnesses, and the error was not harmless because the testimony, other than that of a jailhouse informant, was the only direct evidence linking defendant to the shooting.  *People v. Smith*, No. 2-03-1076 (2005) (unpublished order under Illinois Supreme Court Rule 23).  After concluding that the remaining evidence, absent the erroneously-admitted statements, was sufficient to prove defendant guilty beyond a reasonable doubt, we remanded for a new trial.  *Id.*

¶ 7                                    B. Second Trial - 2008

¶ 8     Defendant's second jury trial occurred in 2008.  The State again called Houghtaling, who, on direct examination, testified that he and defendant robbed the Burrito Express.  Specifically, at 7:20 p.m., on March 6, 2001, while wearing masks, they went to the restaurant and, with defendant holding a pistol, announced a robbery.  Briseno then picked up a knife and chased Houghtaling

and defendant outside. Houghtaling slipped on ice, and Eduardo Pardo, a worker at the restaurant, grabbed him. Someone pulled up Houghtaling's ski mask. Briseno and Pardo wrestled with Houghtaling until defendant walked back, fired shots, and Briseno jerked and let go of Houghtaling. When Pardo let go, Houghtaling ran to McMullan's waiting car. Collett was in the rear of the car. Defendant told Houghtaling that he did what he had to do. The group then drove to their friend's, James Weisenberger's, house directly behind the Burrito Express, and they drank through the night and remained there until the next morning. Houghtaling testified that he wore a green jacket on the night of the murder and that police later took the jacket. Houghtaling further testified that, in exchange for his testimony against defendant, he agreed to a plea deal with the State of 20 years' imprisonment (he faced a possible sentence of 20 to 60 years).

¶ 9     However, on cross-examination, Houghtaling recanted, stating that the testimony he had just given was not true and that he was being forced to lie because the State wanted to convict defendant. He testified that he had been with defendant, Collett, and McMullen that night and that the group had observed the police activity down the road, but were unaware of the shooting. On re-direct examination, the State impeached Houghtaling with statements he made to police in Omaha, Nebraska, in May 2001.

¶ 10     The defense's theory at the 2008 trial was that another group (not connected to defendant) committed the crime. This group, known as the DeCicco group, was linked to a gun—the Brummett gun—recovered in the case. The defense argued that Russell Levand killed Briseno. Defendant called Susanne Dallas DeCicco (Levand's one-time girlfriend) and Adam Hiland (age 15 and DeCicco's cousin), who each denied their involvement in the shooting. Defendant then sought to introduce their prior confessions, but the trial court barred the evidence of Hiland's confessions. Defendant was convicted of murder and attempted armed robbery and was sentenced

to 67 years' imprisonment for murder and a concurrent term of 7 years' imprisonment for the attempted armed robbery conviction. On appeal, this court reversed and remanded for a new trial, holding that the trial court erred in: (1) not allowing the defense to impeach its own witness (Hiland) with a prior inconsistent statement because that witness's testimony affirmatively damaged defendant's case; and (2) admitting certain character evidence. This court also determined that the evidence was sufficient to allow a retrial without a double jeopardy bar. *People v. Smith*, No. 2-08-1106 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 11                                        B. Third Trial - 2012

¶ 12                        1. State's Case-in-Chief - Eduardo Pardo

¶ 13    Defendant's third jury trial occurred in 2012. Pardo testified through an interpreter that, on March 6, 2001, at about 7:15 p.m., two men wearing black masks (through which one could only see their eyes) entered the Burrito Express. One of the men (defendant, under the State's theory) had a gun, wore dark clothing, and was the taller of the two men. This man entered first and spoke (in a language Pardo did not speak) while pointing the gun at Pardo and Briseno. Briseno raised his knife, the men ran out of the restaurant, and Briseno and Pardo chased after them. Briseno ran around the back of a nearby dry cleaners, and Pardo ran around the front of the cleaners. The men ran across Third Street and ran out of sight between a house on the corner of Third Street and Waukegan Road. Pardo saw Briseno stop and talk to someone in a car, but he could not hear what was said.

¶ 14    Across the street from the dry cleaners, behind the Sullivan's Foods store, Pardo saw the man who did not have a gun (Houghtaling, under the State's theory). He wore a green jacket. Pardo caught up to the man in the green jacket after the man slipped and fell (backwards) on ice. It was nighttime and dark out. Pardo called out to Briseno that he had one of the men, and Briseno

instructed him to walk the man back to the restaurant and call police. Pardo grabbed the man's arms from behind and walked him back toward the restaurant. When they reached Third Street, Pardo stopped and heard a gunshot. He saw the man who held the gun in the restaurant, and he saw Briseno. The man fired again. Briseno was close to Pardo, and he was coming toward Pardo and the man in the green jacket. All of the men were across Third Street from the restaurant.

¶ 15    Briseno asked Pardo to walk him to the store so that they could call police. The man with the gun followed them, and Pardo heard two gunshots. He held the man in the green jacket from behind with his arms hooked underneath the man's arms and raised up toward his neck. Briseno walked next to them; Pardo walked backward, and Briseno walked forward.

¶ 16    After the second group of shots, the man with the gun game closer to Pardo and Briseno and started shooting again. Pardo heard Briseno make a sound like, "aah," and he spit blood out of his mouth. Briseno was facing the shooter and away from the man in the green jacket. Pardo could not see if Briseno spit any blood on the man in the green jacket. After Briseno spit up blood, Pardo dropped the man in the green jacket, ran to the restaurant, and called 911. This took three to five minutes.

¶ 17    While on the phone, Pardo could see the parking lot from the restaurant. He observed Briseno holding the man in the green jacket in front of him, with his arms outstretched and his hands just lightly on the shoulders, and using him as a shield. "[H]e was moving him around while the other person kept shooting." After he called 911, Pardo exited the restaurant. The two men were gone. Briseno was lying face down, and there was a lot of blood.

¶ 18    Addressing whether he saw the face of the man in the green jacket, Pardo testified that, behind the grocery store and before he picked him up, Pardo pulled of the man's mask while the man was still on the ground. About two seconds passed between the time he pulled it off and when

he grabbed the man from behind. Also, it was dark behind the store. Pardo got a good look at his face: he observed the man's silhouette and all of his facial features.

¶ 19 Addressing the shooter, Pardo testified that, at one point, the shooter had pulled up his mask to just above his eyebrows. The closest Pardo got to the shooter after he raised his mask was about 25 to 40 feet, and only for a couple seconds. Pardo never saw a third man.

¶ 20 Subsequently, Pardo was interviewed by police and worked with a police sketch artist, who compiled sketches of the two men that he saw. When asked about the green jacket, Pardo described it as long and maybe made of leather. He could not recall if it had any other colors on it. Reviewing People's exhibit No. 66, Houghtaling's green jacket, Pardo stated that the jacket looked like the one he saw on the man during the shooting. (Houghtaling's jacket looks like green leather, does not have black around the collar, but has three front pockets and a zipper with a cover flap; the jacket has areas of black on: the elbows, a patch just below the center back of the collar, around the snaps for the zipper flap, horizontal strips above the lower pockets, and the logo on the breast pocket).

¶ 21 On cross-examination, Pardo testified that he could not recall telling a police interviewer four hours after the shooting that: the green jacket had some black and that the black was around the collar area, to his best recollection. He told the truth to the investigator but was scared. Also, he could not recall if he told the investigator that he did not see any pockets on the front of the jacket, or that there was no zipper up the front.

¶ 22 According to Pardo, at one point, the shooter pointed a gun at him, while walking toward him with his mask pulled up above his forehead. Pardo had his back to the man and was running to call the police. He could not recall if he saw facial hair on the man's chin. He also could not recall if he told the sketch artist whether the shooter had a beard or mustache. (The two resulting

sketches do not depict men with any facial hair.) While working with the sketch artist and on another occasion two days after the shooting, Pardo was shown photographs by police. He never identified anyone in the photos (which included photos of defendant, Houghtaling, and Collett).

¶ 23                              2. Police, Firearms, and Forensic Testimony

¶ 24    Lieutenant Gary Wigman oversaw the crime scene and testified that none of the physical evidence gathered was connected to defendant or any of his alleged accomplices. Police never recovered any potential murder weapon linked to defendant or Houghtaling. He explained that there are two broad categories of handguns: automatics and revolvers. An automatic ejects bullet casings after firing, and a revolver does not. Police found no casings in the vicinity of the Burrito Express and, so, they concluded that the gun used was a revolver. On March 7, 2001, Wigman observed defendant and Houghtaling at the McHenry police department, and he observed defendant to be taller than Houghtaling by about two inches.

¶ 25    Some information concerning the investigation was not released to the public or press, including the fact that Briseno had a head wound and that Pardo stated that Briseno had yelled into a passing car. The facts that were withheld from the public were included in the police reports that were eventually released to the defendants in the cases, as was the coroner's report. As of November 2001, the fact of Briseno's head injury had not appeared in the press. Certain other information, including that the men wore ski masks and that Briseno struggled with one of the men in the parking lot, was released to the public. Wigman testified that warrants were obtained for the suspects in this case around May 6, 2001, and they were arrested either the following day or the day after that. After suspects are arrested, police reports are written and forwarded to the State's Attorney's office and any defendants. McMullen's 2002 trial and defendant's 2003 trial

(both of which included testimony about Briseno's head wound) were covered in detail by the media.

¶ 26    The police received leads concerning the DeCicco group members.  On November 16, 2001, Wigman received a call from Vicki Brummett, and he went to her residence and retrieved a .22-caliber revolver, which, under the defense's theory of the case, was linked to the crime.  He spoke to the Brummetts five or six times.

¶ 27    Joanne McIntyre, an Illinois State Police firearms expert, examined the bullet recovered from Briseno's body and identified it as a .22-caliber long rifle bullet with six lands and grooves. She was unable to determine its twist.  In December 2002, McIntyre received the Brummett gun, a single-action revolver, and fired 10 test shots with it and examined the fired bullets alongside the bullet recovered from Briseno's body.  The Brummett gun is a .22-caliber revolver with six lands and grooves with a right-hand twist.  McIntyre testified that she could neither identify the Brummett gun as having fired the bullet that killed Briseno, nor could she exclude it.  McIntyre further stated that a .22-caliber is a very common type of gun, as are six lands and grooves.

¶ 28    Dr. Larry Blum, a forensic pathologist, performed Briseno's autopsy.  He observed a laceration on Briseno's head caused by contact with a blunt object.  He testified that the injury was consistent with being pistol-whipped with the barrel of a gun.  The injury was not consistent with falling on pavement.  However, Dr. Blum made no determination as to when the wound might have occurred in relation to Briseno's time of death.

¶ 29                                3. Justin Houghtaling

¶ 30    Next, the State presented Houghtaling's testimony, in various forms: (1) direct examination, where he denied involvement in the Burrito Express shooting; (2) a transcript and audio recording of his May 12, 2001, Omaha, Nebraska, interrogation, where he implicated

himself, defendant, Collett, and McMullen in the shooting; (3) April 3, 2002, testimony at McMullen's trial, where he implicated himself, defendant, Collett, and McMullen in the shooting; (4) August 13, 2008, testimony at defendant's second trial, where, on direct examination, he implicated himself, defendant, Collett, and McMullen in the shooting and testified he had not negotiated a plea in Omaha and did not have any police reports at that time, but where, on cross-examination, he recanted his direct testimony; and (5) cross-examination and additional testimony at the third trial, where he denied involvement in the shooting, claimed he was high during the Omaha interview, testified he apologized to McMullen after her trial, and testified that a prosecutor, Robert Beaderstadt, offered him money for his testimony.

¶ 31                              a. Direct Testimony at Third Trial

¶ 32    Houghtaling denied involvement in the shooting, testifying that, at about 6:30 p.m., on March 6, 2001, McMullen and defendant came to his house, picked him up, they picked up Collett, and then drove to Wisconsin so that McMullen could borrow a friend's laptop.   Afterward, McMullen drove the group to McHenry, stopping first at Cloud 9 and then at Wiesenberger's house.

¶ 33    Houghtaling admitted that, in 2001, he pleaded guilty to the first-degree murder of Briseno and was sentenced to 20 years' imprisonment.   When asked why he pleaded guilty to something he alleged he did not do, Houghtaling stated that he "was young.   I was scared, and I thought it would be the quickest route to save myself from doing the extended time in prison of 60 years." He regretted it.   Houghtaling conceded that, at his guilty plea, he told the court that he pleaded guilty of his own free will.   Further, at his guilty plea, when asked if he wanted to say anything, he stated that he " 'wanted the family to know that I'm sorry that it went down.   It wasn't meant to go down that way, and I hope you guys will find it in your heart to forgive me, okay.' "

¶ 34     The following additional testimony was admitted substantively.

¶ 35                    b. May 12, 2001, Omaha, Nebraska, Interrogation

¶ 36     During the Omaha interrogation, which commenced at 1:45 p.m., Houghtaling told police that, on March 6, 2001, he, Collett, "J.D." (*i.e.*, McMullen), and defendant went to a house behind the Burrito Express and drank.  Houghtaling and defendant went outside to smoke a "joint," and defendant stated to Houghtaling, " 'It was like come with me, I want to go do something.' "

¶ 37     Houghtaling agreed and followed defendant to the Burrito Express.  At this point in the interview, police interrogators started asking leading questions about face coverings.  One investigator asked Houghtaling if he wore a ski mask.  He replied, "I can't remember."  The investigator then asked, "You had your face concealed?  Some how [*sic*] you had your face concealed is that correct?"  Houghtaling replied in the affirmative.  When asked, "How did you conceal your face?  With some kind of a hat?"  Houghtaling replied "Yes."  Interrogators then asked, "With a mask over your face?"  Houghtaling replied in the affirmative.

¶ 38     The police interrogators asked Houghtaling who first entered the restaurant, and Houghtaling replied that it was defendant (which was consistent with Pardo's testimony).  Houghtaling also related, without suggestion, that only defendant carried a gun, specifically, a "little .22."  When defendant demanded money after they entered the restaurant, one of the men behind the counter grabbed a knife and Houghtaling and defendant ran outside. The owner chased after them.  When asked if Houghtaling ran toward a busy street or a side street, he replied that it was a side street and not Route 120 (*i.e.*, the busy street).  When asked if anyone other than the owner chased them, Houghtaling replied, "not that I know of."  At some point, someone grabbed Houghtaling, but he could not explain how the person grabbed or held onto him.  He heard gunfire, and "I thought the dude let go of me and I ran.  I was scared."  Defendant was firing the gun toward

the man with the knife (*i.e.*, Briseno). When asked again if more than one person was involved in resisting Houghtaling's and defendant's robbery, Houghtaling replied, "That could be—I can't—it happened so long ago and I don't remember. I'm not a hundred per cent [*sic*] positive, but it could be."

¶ 39 After Houghtaling was nonresponsive to a question asking where he went after he ran away, one of the interrogators asked, "Was anyone waiting anywhere with a car or anything like that?" Houghtaling replied that he could not recall and that he suspected they met back at the house and then left. When asked where they went, he stated that they took Collett home. The police then asked if they stopped at a head shop, specifically Cloud 9. Houghtaling replied that they did and that Collett went inside and Houghtaling stayed in McMullen's car. The police asked Houghtaling to clarify whether, after the shooting, he entered McMullen's car or went to Cloud 9, and he agreed with the suggestion that McMullen waited for Houghtaling and defendant in her car on the street. When asked again later in the interview, he replied, "I think we got into a car. McMullen and Collett were in the car."

¶ 40 After police told Houghtaling that they had witnesses who saw him at Weisenberger's house after the shooting, he agreed that he went there. Houghtaling further stated that defendant planned the robbery. When asked again when he had the conversation with defendant about robbing the restaurant, Houghtaling replied, "I think a little bit in the car [on the way to McHenry] and at [Weisenberger's] house." They sat in the back of the car.

¶ 41 Initially, Houghtaling could not recall what he wore on the night of the shooting. Police then asked him if he had borrowed someone's jacket that night, and he replied that he had borrowed Collett's green jacket. Houghtaling did not see any scar on the victim's forehead. Defendant fired three or four shots. Houghtaling also described the gun. After noting that he knew what a semi-

automatic is, he stated that the gun defendant used "looked like a revolver." However, Houghtaling could not explain the difference between a revolver and an automatic. After one of the interrogators drew a revolver and an automatic for Houghtaling, Houghtaling picked the drawing of the automatic.

¶ 42                                            c. 2002 Testimony at McMullen's Trial

¶ 43    (At the third trial, Houghtaling testified that no one forced him to testify at McMullen's trial and that he made the statements of his own free will.) At McMullen's trial on April 3, 2002, Houghtaling stated that, on the day of the shooting, he and defendant first discussed the robbery earlier that day at Houghtaling's house. While there, defendant gave Houghtaling a ski mask. Houghtaling wore Collett's green jacket. Defendant and Houghtaling put on ski masks before they entered the Burrito Express; defendant entered first with the gun in his hand. There were two people in the restaurant, and no customers were inside. Defendant, pointing his gun at Briseno, demanded that they give him all of their money. Briseno picked up a knife, and Houghtaling and defendant ran outside. Houghtaling ran up an incline behind the cleaners, slipped, was grabbed by Briseno and Pardo, and dragged back to the restaurant. While being dragged, one of the men grabbed Houghtaling's hat; he heard shots fired. Houghtaling was facing outwards and saw defendant firing about four to six shots toward Briseno.

¶ 44    After the last shot was fired, Houghtaling felt a jerk/twitch; Briseno had been hit. Briseno fell, and Pardo ran to the restaurant. When Briseno let go of Houghtaling, Houghtaling ran away. McMullen suggested that they should go to Cloud 9 for an alibi.

¶ 45                                            d. 2008 Testimony at Defendant's Second Trial

¶ 46    On direct examination at defendant's second trial in 2008, Houghtaling implicated himself and defendant's group in Briseno's murder. After Pardo let him go, Houghtaling ran to

McMullen's white car. He did not know where defendant went. McMullen and Collett were in the car, and McMullen drove. However, Houghtaling also testified that, when he got in the car, he said to defendant, "Are you fucking out of your mind." Defendant replied, "I did what I had to do." He wore a green jacket that evening, and they went to Weisenberger's house and stayed until 7 a.m. the next day.

¶ 47 On cross-examination at the second trial, Houghtaling recanted his direct testimony, stating that he had been forced to lie "because they want to convict [defendant] for a crime he didn't commit, none of us committed." He claimed that, "They said if I don't give the testimony that they want me to testify to that they would revoke my plea agreement." He further testified that he read about the case in newspaper articles and read discovery and, thus, was able to testify about it on direct examination. Houghtaling admitted that he wore the green jacket on the day of the shooting and on the following day.

¶ 48 On redirect examination at the second trial, Houghtaling conceded that, when he told police in Omaha that defendant planned the robbery, Houghtaling had *not* negotiated any plea with the State. He also acknowledged that he did *not* have any police reports at the time of the Omaha interview.

¶ 49 e. Cross-Examination & Additional Testimony at Third Trial

¶ 50 On cross-examination at the third trial, Houghtaling denied involvement in the shooting. He testified that he met with police the day after the shooting. Between the day of the shooting and the day of the Omaha interview, he learned certain details about the case, including from newspaper accounts. In his Omaha statement, Houghtaling included the fact that the shooting occurred at the Burrito Express, a fact he learned from newspapers and talking to people.

¶ 51    He maintained that he was at his house on the day of the shooting and, at about 6:20 or 6:30 p.m., defendant and McMullan arrived, stayed for 10 to 15 minutes, and the group then went to Collett's house, where they arrived about 20 minutes later. After 5 to 10 minutes, the group went to Twin Lakes, Wisconsin, to Cally Brown's (McMullen's friend's) house to borrow a laptop. They left Brown's house at about 8 p.m. or earlier. On the way back, they stopped at Cloud 9, Collett went inside for 5 to 10 minutes, and the group then went to Weisenberger's house next to the Burrito Express. On the way, Houghtaling noticed police cars with flashing lights near the Burrito Express. The group spent the night at Weisenberger's house. Houghtaling wore Collett's green jacket, including to the police station on March 7, 2001.

¶ 52    Addressing the May 12, 2001, Omaha interview, Houghtaling stated that he was on his way to California, when police pulled him off of a bus and arrested him. He was 19 years old, had taken hallucinogenic drugs, and was high. The 45-minute interview commenced at 1:30 p.m. The tape recorder was not initially turned on, and Houghtaling told the officers that he had taken drugs earlier that day. Houghtaling denied involvement in the shooting. The officers (falsely) informed Houghtaling that defendant, McMullen, and Collett had already been charged and had given statements. The interrogators also told Houghtaling that, if he told them what happened, they would help him out. At 1:45 p.m., they turned on the tape recorder and elicited his statement. Houghtaling testified that the officers asked leading questions.

¶ 53    On November 14, 2001, Houghtaling pleaded guilty; he was sober. Houghtaling testified that, after McMullen's trial, he wrote her an apology. (In the letter, dated August 30, 2002, Houghtaling stated that the police used a phone book to beat a confession out of him.) At the time of the second trial, he had access to discovery, including police reports and forensic reports. Before he prepared with representatives from the State, his recollection was refreshed.

¶ 54    After his testimony at the second trial, Houghtaling was charged with perjury, voluntarily pleaded guilty to that charge on June 23, 2009, and was sentenced to 5 1/2 years' imprisonment. He also stated that he could be charged with perjury at the third trial. "I'm tired of lying. The truth has to come out sooner or later."

¶ 55    Houghtaling conceded that he testified at the second trial that he wrote letters to the State's Attorney requesting a reduced sentence and money in exchange for testimony. He also referred to assistant State's Attorney Robert Beaderstadt as "a little bitch faggot." At the third trial, Houghtaling similarly asserted that Beaderstadt offered him money for his testimony, but never gave him the money.

¶ 56                                4. Neighbor Kathie Rosenberg

¶ 57    Kathie Rosenberg, lived on Waukegan Road near the Burrito Express in March 2001. She testified that Don's Cleaners was directly north of her home and the northernmost room in her home was her kitchen. Around 7:10 p.m. on March 6, 2001, Rosenberg heard a pop from the direction of the kitchen, then heard men shouting and later heard a serious of five pops, with a gap between the first and second pop and the other four occurring quickly, "right in a row." She believed them to be gunfire and intended to call the police until she saw a police car traveling down Third Street toward the Burrito Express parking lot.

¶ 58                                5. Detective William Brogan

¶ 59    Detective Wiliam Brogan was one of the detectives who interrogated Houghtaling in Omaha on May 12, 2001, along with detective John Jones. Defendant was detained that morning and Brogan and Jones flew to Omaha to interview Houghtaling. Houghtaling was Mirandized. He showed no signs of being under the influence of drugs or alcohol; however, Brogan did not ask Houghtaling if he was on drugs that day.

¶ 60    Brogan also spoke to Houghtaling on November 12, 2001, at the McHenry County correctional facility.   Houghtaling told Brogan that, as they walked to the Burrito Express, defendant "gave him a black knit ski mask and told him to put it on."   Houghtaling told Brogan that he wanted defendant to think he was a tough "gang banger" and could handle himself.   He also related that he and defendant ran out of the restaurant with Houghtaling being in the lead and that Briseno and the other man chased after them.   Brogan asked Houghtaling how he knew that Briseno had been shot, and he replied, "it doesn't take a genius to figure it out."

¶ 61    On cross-examination, Brogan testified that, during Houghtaling's interrogation, interviewers first used certain words, including "handgun," "grabbed," and "gunfire."   Brogan testified that the following information was public at the time of the Omaha interview: the shooting occurred at 7:20 p.m. at the Burrito Express; two men were involved and one had a handgun; that they entered the store wearing black ski masks with eye holes; Briseno and Pardo were in the restaurant when the men entered; the men ordered Briseno to give them money; police thought that Briseno and his employee chased two men out of the restaurant; Briseno had a butcher knife when he was in the restaurant; Briseno, after he and his employee chased the two men outside, caught one of the masked men; Briseno struggled with one of the masked men in the parking lot and was shot by the other masked man.   However, Brogan testified that the fact that Briseno had a wound on his head caused by the blunt object (*i.e.*, a pistol-whipping) was not publicly disclosed, nor was the fact that Briseno had yelled something into a car.   According to Brogan, during the Omaha interview in May 2001, Houghtaling first suggested the following answers in response to nonleading questions: that the gun was a .22-caliber weapon and that his jacket was green.

¶ 62    Brogan further stated that about 15 minutes of interrogation preceded the recorded portion. (Detective Jones prepared a summary of the 15-minute portion of the interview.)   During that time

(*i.e.*, at the beginning of the Omaha interview), Houghtaling denied involvement in the shooting. Police (falsely) told him that defendant, McMullen, and Collett had been charged in the case (actually, McMullen had given a statement) and that Houghtaling could help himself if he gave a statement. Houghtaling then said that he was involved and wanted to give a statement. Brogan further testified that, also at this time, police believed that the murder weapon was a .22-caliber revolver. This was based on McMullan's statement that she had observed defendant with a revolver and because there were no casings found at the scene.

¶ 63                                  6. Detectives John Jones and Jeff Rhode

¶ 64    Detective John Jones spoke to defendant on May 12, 2001, and defendant stated that he was with Collett and McMullen on the night of the shooting and *denied* knowing Houghtaling.

¶ 65    Detective Jeff Rhode interviewed Pardo on the evening of the shooting. He asked Pardo if the jacket worn by one of the suspects was a solid color, and Pardo replied that it was green with some black on it, but that he did not remember well. The next day, at 11:30 a.m., Rhode interviewed defendant, asking him who he was with the prior evening. Defendant responded that he was with "Jennifer, Justin and Dave as I recall. Culick (phonetic) I believe is how he stated his last name."

¶ 66                                       7. David Collett

¶ 67    Collett denied knowing who robbed the Burrito Express. However, on September 13, 2001, he pleaded guilty to attempt armed robbery of the Burrito Express. He explained in 2012 that he did so because it was "a plea of convenience" and because he did not want to take any chances. Collett wanted to avoid a long prison term if he was convicted. He was represented by an attorney, and no one forced him to plead guilty.

¶ 68    At his sentencing hearing after his plea, Collett stated to Briseno's widow (who had testified to the impact his death had on her life):

> " 'I'd just like to say that I'm no—no apology—nothing I can possibly say can help the victims with what they're dealing with, but I can offer my apologize apology [*sic*]. I really if I would have known that any of this would have happened, I really would have tried to do something to stop it, but, honestly, I mean, I really didn't think that anything like that would have happened was going to happen. If the judge, [*sic*] I will follow through with it completely and to the Court's satisfaction. I would just like to apologize again to the victims for their loss. Thank you.' "

¶ 69    Collett denied that he apologized because he had remorse for what he did, explaining that he apologized because "of the grief she was going through."

¶ 70    Collett testified that, on the night of the shooting, he was with defendant and Houghtaling at his father's house near Fox Lake. McMullen picked them up, and they went to Wisconsin to obtain a laptop from Cally Brown. On the way back, they intended to go to Weisenberger's house, but Collett argued with Houghtaling, who would not return his green coat. McMullen pulled over, and defendant told Collett to get out to blow off steam. Collett walked to Weisenberger's house, but he was not home. Collett then went to Cloud 9. On his way, he heard a noise that sounded like a car backfiring. However, on May 12, 2001, Collett told police that, as he walked behind the Burrito Express and up to Weisenberger's backyard, he heard what could have been two gunshots. Collett explained at the third trial that the *police* suggested that the noise could have been gunshots; Collett never heard shots.

¶ 71    On May 12, 2001, Collett told police that he walked back to the car and that defendant and Houghtaling were in the car. At the third trial, Collett denied talking to defendant afterwards about

what happened at the restaurant. On May 12, 2001, however, he told police that, when he got into McMullen's car, defendant stated that some "kids" just robbed the Burrito Express.

¶ 72   As recorded on a Cloud 9 surveillance tape, Collett first appeared in a back room area at 7:38 p.m. and left that area at 7:44 p.m. After he walked out, he got in the car with McMullen, defendant, and Houghtaling, and went to Weisenberger's house. (Collett was the only one with valid identification, which was required to enter Cloud 9.) He drank and watched television. Collett denied that he spoke to defendant about the incident. He explained that they only discussed what they learned in news reports. On May 12, 2001, however, Collett told police that he asked defendant what happened at the Burrito Express and that defendant stated " 'just had some fun.' " Collett testified that he would not have lied to the police "beside the fact that I was 18 and scared."

¶ 73   On cross-examination, Collett testified that he could not recall any scratches, bruises, or blood on defendant or Houghtaling. He denied seeing any weapon on the night of the shooting or seeing anybody with a ski mask.

¶ 74                8. Defendant's Case-in-Chief – Police Testimony

¶ 75   Detective Richard Solarz interviewed Houghtaling on March 7, 2001, at the McHenry police department. Houghtaling wore a green jacket. Solarz did not observe any blood stains on the jacket, nor did he notice any scratches on Houghtaling's face or hands.

¶ 76   Sergeant Michael Brichetto interviewed Pardo on March 8, 2001. He showed Pardo a photo array of five photographs, including those of defendant, Collett, Weisenberger, and Houghtaling. Pardo did not identify any of the photos as being someone involved in the incident. Brichetto was unaware when the photos were taken. Pardo was not shown photos of defendant and Houghtaling that were taken after the incident, and the photo of defendant in the array depicted him *with* facial hair. Pardo was not shown a photo lineup.

¶ 77                                   9. James Weisenberger

¶ 78    James Weisenberger, age 34, testified that he had known defendant since he was 14 years old and that they are good friends.  On the night of the shooting, defendant had facial hair, specifically, a moustache and goatee.  That evening, defendant and his group came to Weisenberger's house.  Before they arrived, Weisenberger observed police activity around the Burrito Express in the plaza behind his house.  Houghtaling wore a green jacket.  Weisenberger did not notice any blood or scratches on his guests, nor did he observe ski masks, weapons, bullets, or shell casings.  He did, however, notice that defendant and Houghtaling were about the same height.  Later that evening, Weisenberger rode in McMullen's car and did not notice any blood, guns, bullets, or ski masks inside the vehicle.  Weisenberger also testified that he has twice tried cocaine, taken "random pills," and smoked marijuana (as a teenager).

¶ 79                                   10. Patrick Anderson

¶ 80    Patrick Anderson was incarcerated during the third trial.  He lived in McHenry in 2001, was good friends with Levand and knew DeCicco.

¶ 81    In the summer of 2001, Anderson was incarcerated in the McHenry County jail, as was Levand.  In July, Levand told Anderson that he was involved in the Burrito Express shooting.  He related that he and DeCicco's cousin (*i.e.*, Hiland) attempted to rob the restaurant, but Briseno chased them out, and Levand fired *over his shoulder* and shot Briseno.  Hiland called Levand for help, and Levand hit Briseno on the head with the gun.  They fled and met with DeCicco, got into her car, and went to Levand's mother's house to clean up (Hiland was covered in blood).  They burned the masks and clothes they wore and tried to clean up DeCicco's car, as there was blood on the back seat.  However, they were unable to clean the car, and, several months later, Levand stole the vehicle and burned it somewhere in Wisconsin.  Levand also told Anderson that he was

not worried about being prosecuted because the State had the gun for several years and nothing had come of it.

¶ 82 Anderson further testified that, while he was incarcerated in McHenry in 2001, defendant was also there. He did not know defendant, defendant never told him about the case, and Anderson never approached defendant with the information he had from Levand or wrote to defense counsel.

¶ 83 On cross-examination, when told that Levand was in jail in June 2001, not July, Anderson stated that "when you're in jail, you really don't pay attention to the months because you're doing time" and that the date could have been June instead of July.

¶ 84 In 1993, Anderson was convicted of aggravated criminal sexual assault; in 2001 and 2005, he was convicted of possession of a controlled substance; and, in 2005 and 2006, he was convicted of retail theft. Anderson was also found guilty in 2011 of attempted unlawful possession of a handgun by a felon and delivery of a controlled substance.

¶ 85                          11. Susanne Dallas DeCicco

¶ 86 DeCicco's statements were presented during defendant's case-in-chief as follows: (1) a videotaped confession to police in November 2005; (2) another videotaped confession to police in January 2006; (3) Vicki Brummet's testimony that DeCicco confessed to her around November 2001; and (4) confessions to three friends/family members.

¶ 87                      a. 2005 Quincy Confession to Police

¶ 88 Sergeant Doug Vandermaiden of the Quincy police department testified that he first interviewed DeCicco on November 19, 2005, after coming into contact with her on November 5 while investigating a retail theft. DeCicco provided her name as "Elizabeth Schwartz." Vandermaiden arrested her, and she was released the same day.

¶ 89    Vandermaiden then contacted DeCicco on November 18, 2005, asking her to come to the police station to discuss the shooting and why she gave a false name. He promised her that, if she was truthful, he would issue a citation and release her. Vandermaiden interviewed DeCicco twice on November 19. She arrived with her mother and boyfriend, and the first interview was videotaped. When questioned about statements she had made about the shooting, DeCicco stated that she made up her story, that it was a joke, and she denied involvement in the shooting. In the second interview, most of which was recorded, DeCicco again denied involvement in the shooting. Vandermaiden issued her a citation for retail theft and released her.

¶ 90    Vandermaiden spoke with DeCicco's boyfriend and with Elizabeth Schwartz. During completion of the booking process, Vandermaiden made a comment about the shooting, and DeCicco bowed her head, started crying, and stated that " 'they made me do it.' " As Vandermaiden walked out to commence a third interview, DeCicco stated that she was surprised that nothing happened when they picked up the gun and that her cousin had hired an attorney because he thought something was going to happen. On audiotape, DeCicco stated that, on the night of the shooting, she was with Levand and Hiland and that Levand was the shooter. Vandermaiden promised DeCicco that she would not be arrested until after Thanksgiving (the following Thursday).

¶ 91    During a third (videotaped) interview, DeCicco stated that Briseno was murdered on March 5, 2001, the date her niece was born. She, Levand (her boyfriend), and Hiland (her cousin) committed the crime. Her sister went into labor that day, and the group went to the hospital. DeCicco sent Levand and Hiland to Vicki's house to retrieve a maternity bag. They took DeCicco's vehicle, a 2001 silver two-door Chevy Cavalier, and were gone for about 1 1/2 hours. It should have taken 30 minutes. They returned and were acting funny. The three later went to

her biological father's, Ben DeCicco's home, and, outside, Levand and Hiland went through her car's trunk. Inside was her stepfather's, David Brummett's, revolver wrapped in a towel. (One day, DeCicco saw Levand and Hiland going through her stepfather's bedroom, and they mentioned the gun.) DeCicco saw the gun and told them to put it back. Levand and Hildand left, and, after 20 minutes, DeCicco drove to look for them. " '[T]hey had talked before about snatching purses or robbing somebody to get money.' " She found them near the Burrito Express, saw them run into the restaurant, run back out later, along with the two men working there. All four ran across the street in front of her car, and one of the Hispanic men turned around and yelled something inside DeCicco's car. She kept driving.

¶ 92     DeCicco returned to her driveway, heard six gunshots, and Levand and Hiland ran out of the woods behind her house. Hiland's face was covered in blood, and he had a cut on his hand. The men got into DeCicco's car (Levand in front and Hiland in back) and ordered her to drive away. When Hiland entered her car, DeCicco saw blood. Hiland told her it was not his own blood. She knew at this point that they had a gun. Levand threw the gun on the *back* seat, and Hiland cleaned it. First, DeCicco drove to Levand's grandmother's house (where they threw out a scarf or gloves) and then she drove to her mother's, Vicki Brummett's, house. At this point, Hiland carried the gun. Hiland put the clothes in a bag and burned them the next day. Hiland and Levand cleaned the gun (he pulled out Briseno's hair from it) and returned it to her stepfather's home. DeCicco told her sister about the incident, who, in turn, told their mother. DeCicco's mother called the police, who subsequently collected the gun. (DeCicco also told her story to her friend Brittany Tyda.)

¶ 93     DeCicco then stated that a detective, Roger Pechous, came to her McHenry County jail cell at one point late at night and told her that the wrong people had been arrested. However, he next

stated that he was joking. He also stated that a detective Brown was a new detective for the "bad guys" and that DeCicco did not have to speak to him and that there were rumors that he had beaten a confession out of one of the suspects. Brown was trying to help defendant. DeCicco stated that Pechous did not intimidate or coerce her or promise her anything. Pechous recommended to her that she not speak with Brown and that she not tell anyone that Pechous came to speak to her. DeCicco believed that Pechous knew that her group was guilty.

¶ 94    Levand told her that one of the men in the restaurant *threw* a knife at him and Hiland, who then ran out of the restaurant. Levand also told DeCicco that one of the restaurant workers caught Hiland and dragged him across the parking lot. Levand became frantic and started shooting. The final shot hit Briseno. Levand heard him say "uhhhh" and spit blood on Hiland. Briseno raised his knife and struggled with Hiland and Levand came up and hit him on the head. Months later, DeCicco's car was stolen. Levand and Hiland took her car to Wisconsin and burned it because it had bloodstains on the back seat.

¶ 95    DeCicco also related that she told her sister, mother, and a friend that Levand and Hiland committed the robbery, but she did not contact police out of fear of being hurt by Levand and Hiland.

¶ 96                                    b. 2006 Confession to Police

¶ 97    Turning to DeCicco's second confession, Sergeant Virgil Schroeder of the Illinois State Police testified that, on January 26, 2006, at the State's request, he (and William Kroncke) interrogated DeCicco, who was incarcerated at the Dwight correctional facility (for retail theft). Schroeder testified that DeCicco made accusations against members of the McHenry police department. The state police investigated such allegations, and there was no finding of malfeasance by the McHenry police department.

¶ 98    In DeCicco's 2006 version of the events, she stated that the shooting occurred either on March 5, or 6, 2001.  She first mentioned that Levand and Hiland each wore masks when they entered the Burrito Express, but, later, when asked why Levand or Hiland (it is unclear to whom the interrogators are referring) had to clean blood off his face when he wore a mask, she stated that Levand wore a mask and Hiland wore a *scarf* over his face.  She also stated that Hiland had (Briseno's) blood on his face and that it had dripped onto his shirt.  At another point in the interrogation, DeCicco described Hiland and Levand as *both* covered in blood.  By the time they reached DeCicco's mother's house in Johnsburg, Levand had cleaned off the blood from his face. When asked how she knew that Levand and Hiland had a gun when they arrived at her father's house from the hospital, DeCicco stated that she saw them looking through her car's trunk and, although she did *not* actually see the gun, she knew for certain later when she saw it near the restaurant that that was what they were handling in her trunk.  (In her 2005 version, DeCicco stated that she *saw* the gun when Levand and Hiland unwrapped the towel; she described it as a revolver; and stated that she told them to put it back inside the house.)  In 2006, DeCicco stated that she saw the gun twice: when Levand and Hiland entered the restaurant and when Levand ran toward her car.  Also in this version, DeCicco stated that Levand sat in the front seat with the gun.  (In 2005, she told the interrogators that Levand threw the gun on the back seat.)

¶ 99    DeCicco also stated (as she had during her 2005 Quincy interrogation) that Pechous came to her cell in the jail late at night and told her not to speak to the new detectives (who "were for the bad guys," including a detective Brown) and not to tell them that Pechous and another detective came to see her.  When the interrogators told her in 2006 that Pechous' visit was not secret (because he had written a report about it), that he reported a second visit, and that he did not report that he met with her in the middle of the night, DeCicco responded, "It's been a while."

¶ 100   DeCicco noted for the interrogators that the fact that Briseno was hit in the head with the gun " 'was not in the papers anywhere.  How would I know that unless the people who did it actually told me?' "  She was uncertain if she heard six gunshots.

¶ 101   DeCicco stated that she spoke to McMullen while they were both incarcerated in the McHenry County jail and that McMullen stated that another woman in the jail was claiming that she was involved in the shooting.  McMullen denied that she was involved in the shooting.  DeCicco had told McHenry police that she never told anyone that she was involved and that she never told a cell mate.  When confronted with these inconsistencies, DeCicco stated that she was scared.

¶ 102   DeCicco also mentioned during the interrogation that Hiland told her that he saw an attorney because "they thought—after they took, after they took the weapon, everybody thought we were going to jail."

¶ 103   The interrogators next confronted DeCicco about statements she had made to the McHenry police department.  DeCicco had initially told the police that she lied about her group's involvement in the shooting.  DeCicco denied this to the interrogators and denied that she told them she had never been in a cell with McMullen.  DeCicco also told interrogators that she first told her sister about the incident, but later told her it was not true.  She also stated that the first time she saw the gun was in Levand's hand outside the Burrito Express.  Her parents never told her that there was anything wrong with the gun.

¶ 104   Hiland told her that he saw an attorney after police took the gun because "everybody thought we were going to jail."

¶ 105                      c. 2001 Confession to Vicki Brummett

¶ 106   Vicki Brummett, DeCicco's mother, testified that she is married to David Brummett. She has been convicted of possession of a controlled substance. In March 2001, DeCicco, Levand, and Hiland lived, off and on, with Brummett in her home in Johnsburg. When she was not living with Brummett, DeCicco lived with Ben DeCicco, her biological father, in McHenry on Waukegan Avenue near the Burrito Express. On March 6, 2001, Brummett was at the hospital with her daughter Elizabeth Schwartz, who had just had a baby. She left the hospital after dark and went home. On her way, she saw police activity near the Burrito Express. When she arrived home, DeCicco, Levand, and Hiland were at her house, in the basement. Prior to the shooting, Hiland did not have scratches on his body; however, afterwards, his hand and knees had scratches on them.

¶ 107   Brummett's husband owned a handgun that he kept in their bedroom closet; it was wrapped in a blue towel. Others in the household had access to the bedroom. Around November 2001, she had a conversation with DeCicco about the Burrito Express shooting. DeCicco confessed to her mother, telling her that, on the evening of March 6, 2001, DeCicco drove to pick up Levand and Hiland and found them standing outside the restaurant. Levand and Hiland ran inside and, later, everyone ran out. One man ran in front of DeCicco's car and yelled for her to call the police. DeCicco told Brummett that she drove home. She also told her mother that the gun belonged to the Brummetts and that "the guy was hit with the gun and that she thought they'd find out—we'd find out that they used the gun because there was a crack in the barrel—or the handle."

¶ 108   Brummett conceded that her granddaughter was born on March 5, 2001, not the following day. The day that Brummett heard the sirens was the day after her granddaughter was born. DeCicco had a drug problem, had asked Brummett for money, and lied to her on more than one occasion.

¶ 109                                    d. Confessions to Family/Friends

¶ 110   Brittany Tyda, a childhood friend of DeCicco's and Levand's, testified that DeCicco confessed to her about the Burrito Express shooting in October 2001 while at Tyda's apartment in McHenry. DeCicco cried and was upset and stated that she saw Levand and Hiland attempt to rob the Burrito Express. DeCicco related that the store manager grabbed Hiland and had a knife; Hiland screamed for Levand, and Levand shot the manager. In another statement, while they were in Tyda's apartment, DeCicco told Levand that, if he went to the police about DeCicco writing bad checks (which he had threatened to do), then "she would go to the police about him shooting someone." They were having an argument.

¶ 111   Elizabeth Schwartz, DeCicco's sister and Hiland's cousin, testified that she was currently incarcerated for retail theft and had previous convictions for forgery and burglary. DeCicco visited her in the hospital on March 6, 2001. Schwartz's daughter was born the previous day. At that time, DeCicco lived with Ben DeCicco near the Burrito Express. About three weeks after the shooting, while they were at the Brummett residence, DeCicco told Schwartz that Hiland was involved in the Burrito Express shooting. DeCicco did not provide any additional information. Schwartz told her mother. Schwartz further testified that, in the week following the shooting, she noticed that Hiland had cuts on the inside of his hand and bruises on his arm. He told Schwartz that he had fallen down Ben DeCicco's back stairs.

¶ 112   Two to three months after the shooting, Hiland confessed to Schwartz. They were in her van outside a restaurant near the Burrito Express. Hiland did not want to exit the van, fidgeted, became irritated and panicked. Schwartz told Hiland that DeCicco told her that he was involved in the shooting. He replied, " 'She is a fat fucking bitch and she can't keep her mouth shut. She needs to keep her mouth shut.' " Hiland asked Schwartz to drive away. As they drove away,

Hiland stated that the DeCicco group had been smoking crack on the night of the shooting and that DeCicco dropped off Hiland and Levand at the Burrito Express. Hiland and Levand went inside the restaurant to rob it, but they were chased out. Schwartz explained that, "Well, one of them got ahold of my cousin [*i.e.*, Hiland] with a knife and when he was trying to stab him, he was forced to grab hold of it, yelling for [Levand] to help. And I'm not—I can't remember which way it went, whether [Levand] was shooting while he was running or if he had to come up and hit him in the head and he still wouldn't stop, so then he shot him. I can't remember how it went." Schwartz clarified that she could not recall if Levand hit Briseno first (she was uncertain with which part of the gun) or shot him first. DeCicco picked them up afterwards. In 2003, Schwartz stated in a written statement that Levand hit Briseno with the butt of the gun. Schwartz further testified that, when DeCicco was arrested, she sometimes used Schwartz's name. Schwartz testified that DeCicco was not always truthful with others.

¶ 113    Carly Rexford, DeCicco's half-sister (their father is Ben DeCicco), testified that she visited Schwartz at the hospital on March 6, 2001. DeCicco was there, too, but left before Rexford, stating that Levand and Hiland were waiting for her in her car. At the end of 2005, DeCicco and Vicki Brummett were at Rexford's home in McHenry. DeCicco told Rexford that she confessed to police about the Burrito Express shooting because it had been weighing on her conscience. DeCicco told Rexford that Hiland and Levand took David Brummett's gun and that the victim grabbed Hiland and Levand shot him. Levand had threatened her that, if she ever told anyone about their involvement, she would be punished. Rexford had heard that DeCicco and Levand had a stormy relationship, but never witnessed it. She had also heard that DeCicco used narcotics, but never witnessed it.

¶ 114                                    12. Hiland's Confessions

¶ 115   Defendant presented testimony concerning Hiland's confessions to: (1) R. Daniel Trumble in the summer of 2002; (2) Gina Kollross days and weeks after the shooting; and (3) Charlene Nicky McCauley before Christmas 2001.

¶ 116                    a. 2002 Confession to R. Daniel Trumble

¶ 117   R. Daniel Trumble has a conviction related to writing bad checks.  He lived with Hiland in 2001 or 2002 and testified about three conversations they had in the summer of 2002.  First, Hiland told Trumble that the wrong people had been arrested for the Burrito Express murder, and he was involved in it along with DeCicco and Levand.  Trumble testified that Hiland was shaking and crying, they had been drinking, and the planned robbery had "gone wrong" because one of the workers pulled a knife.  Hiland told Trumble that Levand was the shooter.

¶ 118   In their second conversation a few days later at a restaurant, Hiland was sober and told Trumble about a shooting.  He was upset and emphasized that Levand was the shooter.  During a third conversation, on the way home from the restaurant, Hiland stated that, since someone else was arrested, he was not going to do anything.  Trumble never contacted the police.

¶ 119                    b. Confession to Gina Kollross

¶ 120   Gina Kollross testified that Hiland once lived with her and that he is her sister's (Charlene McCauley's) brother.  Kollross knew DeCicco and Levand.  Kollross dated Andrew Hiland, Adam Hiland's brother, in 2001.

¶ 121   Kollross testified that Adam Hiland first spoke to her about the shooting a couple of days after it occurred and while they were in Vicki Brummett's basement.  Andrew was also present.  During a second conversation, one to two weeks after the shooting, in an apartment in Hebron, Adam Hiland confessed to Kollross.  He told her that the group had planned to go in and rob the

restaurant, but the owner chased him with a knife. Briseno "was going after his arm and his hand." Levand shot him to free Hiland.

¶ 122 When Kollross saw Hiland in the days after the shooting, she noticed that his hand was wrapped up. He first stated that he fell downstairs, but later stated that he was cut with a knife during the shooting. Levand, DeCicco, and Hiland were drug users.

¶ 123                     c. Confession to Charlene Nicky McCauley

¶ 124 Charlene Nicky McCauley, Hiland's sister, testified that, in 2001, she lived with the Brummetts. DeCicco, Levand, Hiland, and Schwartz also lived with the Brummetts. While living there, McCauley observed the DeCicco group pick the lock to and enter the Brummetts' bedroom. One day after the shooting, McCauley observed Hiland with bandages on his forearms. He explained that he slid on icy stairs at Ben DeCicco's house.

¶ 125 McCauley moved out of the Brummett house in the summer of 2001. Right before Christmas 2001, Hiland confessed to McCauley, telling her that the DeCicco group was at DeCicco's father's house, smoking crack in the garage. They ran out of drugs and wanted to get more money, so, the group decided to rob the Burrito Express. Levand and Hiland went inside, and the owner started to chase after them. One of the men grabbed Hiland, they fought, and Levand shot him. After Hiland confessed to McCauley, he appeared depressed, ashamed, and relieved.

¶ 126 McCauley denied telling representatives of defendant that, after her conversation with Hiland, she gave him money. Hiland did not tell McCauley that he was cut during the shooting. She might have told the representatives that Hiland was cut during the shooting because she assumed that to be the case. McCauley never contacted the police.

¶ 127                     13. State's Rebuttal – Roger Pechous

¶ 128   Roger Pechous, a detective with the McHenry police department in 2001, testified that, at the time, he had known DeCicco in his professional capacity for seven years.  He denied ever going to the correctional facility in the middle of the night to interview her.  He also denied telling DeCicco that there was a detective Brown working for the "bad guys" or telling her not to speak to a detective Brown.  He did not know a detective Brown and never told DeCicco that his department had arrested the wrong individuals.

¶ 129                                      14. Russell Levand

¶ 130   Russell Levand testified that Patrick Anderson was an acquaintance and that they were both incarcerated in the McHenry County jail from June 6, through June 11, 2011.  Levand was incarcerated for drug possession and burglary.  (At the time of trial, he was on probation for theft and drug possession.)  Levand denied that he confessed to Anderson and denied that he was at the Burrito Express on the night of the shooting.  Levand dated DeCicco from when he was ages 14 to 17.  He broke up with DeCicco on March 7, 2001.  He met his wife, Wanda Levand, on March 10, 2001.

¶ 131   On cross-examination, Levand testified that, in 2003, he was convicted for aggravated battery in McHenry County.  In 2004, he was convicted of obstructing justice; in 2005, he was convicted of possession of a controlled substance in Cook County; and, in 2006, he was convicted of theft in McHenry.  Levand denied that he "played" with the Brummett gun and denied that he was involved in the Burrito Express shooting, ever shooting a gun, or telling DeCicco that he was involved.  Levand testified that he was at a hotel when DeCicco's car was stolen in June 2001.  He did not have a conversation with Anderson about the car in the summer of 2011.

¶ 132                                      15. Susanne Dallas DeCicco

¶ 133   Susanne Dallas DeCicco, age 29, testified that she dated Levand for a few years.  In 2002, DeCicco was convicted of obstructing justice and possession of a controlled substance; in 2004, she was convicted of theft; in 2005, of retail theft (twice) and obstructing justice; and she was currently incarcerated for unlawful possession of prescription medication.

¶ 134   DeCicco denied that Roger Pechous came to see her in the middle of the night while she was in a correctional facility, but she told state police that he had done so.  When initially asked why she told the story, she replied, "I don't have an answer for that.  I can't make sense of a lot of things that I said."  When asked again about her statements to state police, DeCicco stated that she was in the Department of Corrections and "they then came to see me and knowing that I had lied to the Quincy [p]olice [d]epartment, I feared further charges before I was released from prison at the time.  It just somehow made sense to me that if I just lied a little longer, I'd be able to get out and deal with it later.  *** I wanted to get out and I thought if I told them I lied, I would have got in more trouble."

¶ 135   Addressing McMullen, DeCicco stated that she has met her on two occasions, including at the Dwight correctional facility.  DeCicco denied that she ever had a conversation with McMullen about the shooting.  DeCicco followed the story in the news.  She told her family that she was involved in the shooting because she was a heroin addict and her family gave her money for drugs.  Initially, the story was "a joke" between DeCicco and her sister, Elizabeth Schwartz.

¶ 136   When questioned why she told personnel from the Quincy police department that she had knowledge of the Burrito Express shooting, DeCicco testified that "because when I said no, it wasn't a good enough answer and I was told that I would definitely be leaving that day if I basically said something different and I was ready to go home."  One of the interrogators had called her the previous day and told her that she would be able to leave if she told the truth.  DeCicco arrived

with her mother and boyfriend. The interview was on Saturday, November 19, 2005, and she wanted to be released before Thanksgiving the following Thursday. She confessed during the interview because she wanted to leave jail that day. She did not contemplate that confessing to a role in a murder could possibly involve additional incarceration time.

¶ 137 DeCicco denied that she read police reports in this case. She acknowledged testifying in 2008, but stated that she could not recall if she represented at that time that she had reviewed police reports. On the day of the shooting, DeCicco was in the process of moving from Ben DeCicco's house to Vicki Brummett's house. She also visited her sister in the hospital. Levand and Hiland were there. They left for about one hour to retrieve Schwartz's maternity bag. They returned, and DeCicco then left with them. They drove to Ben DeCicco's house, which is around the corner from the Burrito Express. Hiland and Levand were helping DeCicco move. DeCicco denied (but also stated that she did not remember) that she saw a blue towel in the trunk of her car when Hiland and Levand were standing by it. (She could not recall if she had testified in 2008 that she saw it.) She knew that David Brummett kept a gun in his closet wrapped in a blue towel.

¶ 138 In June 2001, DeCicco attended a party for her brother at a hotel in Gurnee. Her brother drove DeCicco in his car. Hiland and Levand came to the party in DeCicco's car. When she woke up the next morning, DeCicco noticed that her car was gone. She contacted the police and later learned that her car was burned.

¶ 139                                     16. Adam Hiland

¶ 140 Hiland testified that he was currently in custody for fleeing and eluding (out of Wisconsin). He had been convicted of attempted burglary, possession of a controlled substance (twice in 2004), aggravated fleeing of a peace officer in 2005, aggravated battery in 2008 and 2011, and fleeing or eluding a peace officer (in 2011). Hiland denied that he had ever been cut with a knife on his

hands or arms. (The State had Hiland show his hands and arms to the jury.) Hiland testified that he had a scar on his hand from when he was tased on his most recent fleeing-and-eluding case; he "hit the pavement and it knocked a chunk of skin out of my hand." The police tased him because he was running. Hiland denied that he told his cousin Elizabeth Schwartz that he got the scar by grabbing a knife at the Burrito Express.

¶ 141                                    17. Verdict

¶ 142 Defendant was convicted of first degree murder and attempted armed robbery and sentenced to 67 years' imprisonment for the murder conviction and a concurrent 7 years' imprisonment for attempt armed robbery.

¶ 143                            18. Appeal from Third Trial

¶ 144 On appeal, this court held that the evidence was sufficient to convict defendant. *Smith*, 2013 IL App (2d) 120508-U, ¶¶ 156-72. We noted that the jury heard that Houghtaling pleaded guilty to participating in the shooting and his prior statements—the Omaha interview (which, significantly, was conducted before any plea deal), his testimony at McMullen's trial, and his direct testimony at defendant's second trial—incriminating defendant, which were the strongest evidence against defendant and sufficiently corroborated Pardo's (the only eyewitness's) testimony of the events. *Id.* ¶ 156. We determined that this evidence, along with the additional evidence presented against defendant and his group, was such that any rational trier of fact could have found beyond a reasonable doubt that defendant committed the crimes. *Id.*

¶ 145 Houghtaling testified that he pleaded guilty to the crime in November 2001, about eight months after it occurred, was represented by an attorney, and he agreed to testify truthfully against defendant, McMullen, and Collett in exchange for receiving a 20-year sentence. In his Omaha statement, which, again, was conducted before the plea deal, Houghtaling stated, without

suggestion, that defendant carried a "little .22," which was consistent with the type of gun the police believed was used in the shooting, and he stated that his jacket was green, which was consistent with Pardo's testimony. On redirect examination at defendant's second trial, we further noted, Houghtaling acknowledged that he did not have any police reports at the time of the Omaha interview. Also, we noted that the sketch of the man wearing the green jacket that was prepared from Pardo's statements bore a *striking* resemblance to Houghtaling and did *not* bear a strong resemblance to Hiland.

¶ 146   Defendant himself, according to police detectives, gave conflicting statements about his relationship with Houghtaling. According to detective Jones, defendant stated on May 12, 2001, that he was with Collett and McMullen on the night of the shooting; however, when asked if he was also with Houghtaling, defendant did not acknowledge or deny it, but stated that he did not know Houghtaling. This was contradicted by Houghtaling (even in his direct testimony), Collett, and Weisenberger, who testified they were with defendant and Houghtaling on the night of the shooting. Further, defendant himself contradicted this statement when he spoke to detective Rhode, who testified that defendant stated on the day after the shooting that he was with Houghtaling (and the rest of his group) the prior evening.

¶ 147   As to Collett, although he denied involvement in the crime, we concluded that the jury could have found this incredible and instead found significant his apology to Briseno's widow and inferred that he had remorse for committing the crime with defendant's group. Also, notably, the jury could have placed significant weight on the fact that Collett pleaded guilty to attempted armed robbery and discounted his explanation that it was merely "a plea of convenience." The jury heard that Collett had initially told police that he heard gunshots from the area of the restaurant. (The jury also heard that McMullen was convicted for her participation in the crime.)

¶ 148  We rejected defendant's argument that Houghtaling's prior inconsistent statements were insufficiently trustworthy to sustain defendant's convictions.  We concluded that they were consistent with each other and corroborative of Pardo's testimony.  Houghtaling stated twice (in Omaha and at McMullen's trial) that defendant entered the restaurant first and carried the gun; this was consistent with Pardo's testimony that the man with the gun entered first and the man in the green jacket followed him.  Houghtaling also stated in three statements (albeit, the first time in Omaha, in response to a leading question) that he and defendant concealed their faces and twice stated (at defendant's second trial and McMullen's trial) that they wore ski masks.  This was consistent with Pardo's testimony that the men wore masks covering all but their eyes.  Houghtaling also testified three times that defendant announced the robbery after he and Houghtaling entered the Burrito Express; this was consistent with Pardo's statement that the man with the gun stated something in English to Briseno, which resulted in Briseno raising his knife and chasing them out of the restaurant.  (Houghtaling also related the chase in his statements.)  During the Omaha interview, Houghtaling was asked whether he ran toward the busy street or the side street and he responded, without suggestion, that he ran toward the side street.  This was consistent with Pardo's testimony that he chased Houghtaling across Third Street.  At both McMullen's trial and defendant's second trial, Houghtaling testified that he fell on ice and that one of the men caught him.  This testimony was consistent with Pardo's statement that the man in the green jacket fell on ice.  Pardo, further, was asked about the green jacket that Houghtaling wore on the night of the shooting and stated that it looked like the one the man involved in the crime had worn.  Houghtaling also related in three statements that he was caught while defendant was outside his view and that defendant later arrived/came into view and fired shots.  Pardo similarly testified that he ran in front of a nearby dry cleaners and that Briseno ran behind it and, at one

point, he could see only the man in the green jacket, with whom he caught up after the man slipped and fell on ice. Pardo testified that he did not see the man with the gun again until he had reached Third Street (while he was dragging the man in the green jacket).

¶ 149   We rejected defendant's argument that Houghtaling's Omaha confession was given while he was under the influence of drugs and, thus, was inherently unreliable. The jury, we noted, heard detective Brogan testify that Houghtaling showed no signs of being under the influence of drugs or alcohol. It was the jury's function to weigh witness credibility, and, viewing the evidence in the light most favorable to the State, we had no quarrel with its resolution.

¶ 150   We further noted that Pardo's failure to identify defendant or Houghtaling from the photo array was known to the jurors, as was the fact that the sketch prepared of defendant from Pardo's description did not show facial hair (defendant's booking photo, taken within days of the shooting, showed that he had facial hair). The jury weighed this evidence, and the jurors were aware that it was dark out during the shooting and that defendant's face was visible only when he was about 25 to 30 feet away from Pardo.

¶ 151   We rejected defendant's argument that Houghtaling's statements were inherently unbelievable because: (1) they were inconsistent; (2) he was an alleged accomplice who received a plea deal and thus had a motive to lie; and (3) his testimony was the only evidence implicating defendant. Any inconsistencies in Houghtaling's testimony or statements, we noted, were before the jury and did not render his testimony inherently unreliable, but merely affected the weight to be given to the testimony, which was the jury's role to assess. We rejected the suggestion that any inconsistencies cast doubt on the jury's verdict.

¶ 152   We also rejected defendant's argument that the physical and circumstantial evidence (other than Houghtaling's statements) did not support a conviction. Defendant had asserted that there

was no physical evidence linking him to the crime, arguing that the crime scene was bloody, but that neither defendant nor Houghtaling had blood on their clothes that night or the next day. Nor did McMullen's car have blood stains, and neither defendant nor Houghtaling showed signs of injury. We determined that defendant's characterization of the crime scene as bloody was not supported by the evidence, where the only testimony on that point concerned Briseno coughing up blood after being shot. At this point, according to Pardo, Briseno was using Houghtaling as a shield, but held him at arm's length. Further, Pardo did not testify that he saw blood on the man with the green jacket, and there was no testimony that the shooter was close to Briseno after he coughed up blood. As to McMullen's car, it was not recovered until more than two months after the shooting, which provided sufficient time to clean or destroy any physical evidence. Also, the lack of physical injuries to Houghtaling did not, we determined, cast doubt on his credibility, where it was undisputed that the green leather jacket he wore covered his arms.

¶ 153 Finally, we also rejected defendant's argument that it was unbelievable that, after the shooting, Collett walked into Cloud 9. His actions were, we noted, consistent with providing an alibi for the group. Further, we noted that Houghtaling told police in Omaha, without suggestion, that only Collett went inside Cloud 9.

¶ 154 As to defendant's theory that the DeCicco group committed the crime, we rejected defendant's argument that he presented compelling evidence of that group's culpability that overwhelmed the State's case against him. Although DeCicco knew two facts that were not made public—*i.e.*, that Briseno was hit in the head with a gun and that he shouted into a passing car— we disagreed that the evidence against the DeCicco group was far stronger than that against defendant. DeCicco's confessions to police, which were central to defendant's case, were, we concluded, fraught with significant inconsistencies. She told police in 2005 in Quincy that she

saw the Brummett gun when Levand and Hiland were going through her car trunk (and before she drove and found them at the Burrito Express). However, in 2006, she told police that she did not see the gun until later while near the restaurant: when the men entered the restaurant and when Levand ran toward her car. DeCicco's recollection of the date of her group's alleged involvement in the shooting was incorrect, because she stated that it occurred on the date of her niece's birth, which was March 5, 2001, whereas the shooting took place on March 6, 2001.

¶ 155  DeCicco also told police in Quincy that detective Pechous had come to her jail cell in the middle of the night to tell her that another officer was trying to help defendant and that Pechous knew that her group was guilty. This statement was contradicted by Pechous, who had prepared a report of his conversation with DeCicco, wherein he reported that he did not meet with her at night and that he visited her twice. (When confronted with this, DeCicco stated that, "It's been a while.") Also, sergeant Schroeder testified that state police investigated the allegations and that there were no findings of malfeasance by the McHenry police department. DeCicco also told police that Briseno threw a knife at the two men after they entered the restaurant, but no knife was ever recovered from the floor and Pardo did not mention this in his testimony; a knife was recovered near Briseno's body. Further, DeCicco's description of the mens' facial coverings were not consistent with Pardo's description that both men wore masks: DeCicco stated first in 2006 that both Levand and Hiland wore masks; however, she later stated that Hiland cleaned blood off of his face and that he had worn a *scarf*. (She also testified that both men were covered in blood.)

¶ 156  The jury also heard that DeCicco used drugs (like Houghtaling and defendant) and, further, that she lied to obtain money for drugs. DeCicco testified that, when she spoke to state police in 2006, she confessed to being involved in the shooting because she could get "out on the streets faster" so she could buy drugs. Also in 2006, she first stated that she had not read the confessions

in the case and then stated she had (before catching herself): "Me too and I've also, or I haven't seen." She then explained that she had read newspaper accounts and not read the actual confessions. DeCicco's testimony concerning Hiland cutting his hand with the knife was also suspect, we noted, because the DNA recovered from the knife belonged only to Briseno.

¶ 157 As to DeCicco's statement that Briseno shouted out something at her while she was allegedly in her car and leaving the scene, the details that she related about the incident, we determined, cast doubt about her involvement. DeCicco stated in 2005 to police that she followed Levand and Hiland after they started walking to the Burrito Express; she was in her car. She saw them run into the restaurant and DeCicco started to pull away in her car. However, "all four of them *** darted across the street in front of me. One of the Hispanic men turned around and yelled something in my car. I just kept driving." Pardo did not testify that the four men ran as a group across the street, but that, after the two men ran out of the restaurant, he ran in one direction in front of the cleaners and Briseno ran behind the cleaners. Pardo lost sight of the two men after they crossed Third Street and ran near a house. At one point, as Briseno and Pardo followed the men, Pardo saw Briseno stop and talk to someone in a car. Thus, he did not state that all four men ran across the street at the same time in a group. Further, Pardo testified that he did not see defendant outside until defendant approached from about 25 to 30 feet away and after Pardo had caught the man in the green jacket.

¶ 158 As to the Brummett gun (a .22-caliber revolver with six lands and grooves), although McIntyre could not identify it as having fired the bullet that killed Briseno, she could not exclude it. However, she stated that a .22–caliber gun is a very common type of gun, as are six lands and grooves. DeCicco's statement that Briseno was pistol-whipped was consistent, we noted, with what the detectives believed occurred during the shooting and was information that was not

released to the public. However, Pardo never testified that he witnessed the shooter strike Briseno with his gun and Dr. Blum, the pathologist, concluded only that the laceration of Briseno's head was caused by contact with a blunt object and that this was consistent with being pistol-whipped with the barrel of a gun; however, he made no determination as to the timing of the wound. Finally, DeCicco told state police during her 2006 interview not only that Briseno was hit in the head with a gun, but also that this information " 'was not in the papers anywhere. How would I know that unless the people who did it actually told me?' " The fact that DeCicco stated that the pistol-whipping was not in the papers, we determined, could have reflected merely that she read new reports of the crime or reflected that this non-public information was not kept as secret from the public as the police desired. It was the jury's function to assess this testimony, and we could not determine that, given the foregoing, her testimony rendered Houghtaling's testimony inherently unreliable.

¶ 159 Finally, as to the DeCicco group's confessions to third parties, the jury heard that testimony, including that several witnesses had prior convictions involving deceit (Anderson, Schwartz, and Trumble) and that several of the alleged confessions occurred long after the shooting (Hiland's confession to Anderson; DeCicco's confession to Rexford; and Hiland's confession to Trumble). It was the jury's function to assess witness credibility, we noted, and it found Houghtaling's prior statements credible and the DeCicco group's confessions incredible. We also rejected defendant's contention that Hiland's repeated confessions raised a reasonable doubt about the State's case, including because they contained details that explained the gaps in the State's case against defendant. Defendant focused on the scrapes and bruises the witnesses observed on Hiland in the days following the shooting, we noted. We concluded that Pardo's description of the shooting did not necessarily lead to the conclusion that the man in the green jacket sustained

such injuries. Further, the witnesses also testified that Hiland offered an alternative explanation for his injuries: he had slipped and fallen on icy stairs at Ben DeCicco's house.

¶ 160    Following our decision, defendant petitioned for leave to appeal to the supreme court. The court denied his petition. *People v. Smith*, No. 116291 (Sept. 25, 2013).

¶ 161                                C. *Habeas* Proceedings

¶ 162    Next, defendant petitioned for a writ of *habeas corpus* (28 U.S.C. § 2254(d) (2018)), arguing that: (1) this court unreasonably applied *Jackson v. Virginia*, 442 U.S. 307 (1979), in finding that the evidence was sufficient to sustain his convictions; and (2) alternatively, in affirming certain evidentiary rulings, this court violated his constitutional right to present a complete defense and his rights under the sixth amendment's confrontation clause. The District Court granted defendant's petition on the basis of the evidentiary errors and vacated his convictions and sentence, subject to the State's decision to retry him. *Smith v. Brookhart*, 2020 WL 1157356 (N.D. Ill. 2020).

¶ 163    The State appealed from the issuance of the conditional writ, and defendant cross-appealed from the denial of the unconditional writ. The Seventh Circuit held that the evidence was insufficient to sustain defendant's convictions, characterizing this court's holding as "not just wrong, but unreasonable[.]" *Smith v. Brookhart*, 996 F.3d 402, 405 (7th Cir. 2021). It reversed the district court's judgment and ordered an unconditional issuance of the writ. *Id.*

¶ 164    Specifically, the Seventh Circuit first took issue with the State's reliance on Pardo's statement that Houghtaling's jacket "looks like" the green jacket he saw on the day of the shooting, stating that Pardo's statement was "well short of a positive identification." *Id.* at 414. Second, the court turned to Houghtaling's Omaha confession, determining that he did not provide *any* details that the police did not already know. *Id.* at 415. Addressing Houghtaling's statement that

defendant carried a .22-caliber handgun, the Seventh Circuit pointed out that Houghtaling later could not correctly choose between an automatic and revolver and took issue with the State "downplay[ing]" the ballistic expert's inability to exclude the Brummett gun as the murder weapon and its characterization of it as a common type of gun, noting that the State was "notably quiet" on the .22's popularity when explaining how critical it was that Houghtaling correctly said that defendant carried a 'little 22.' " *Id.* The court also noted Houghtaling's omissions, specifically that he failed to mention that one of the men stopped and yelled something at a passing car; that two men were in pursuit; and his answer in the negative when asked if Briseno was hit " 'with the gun or anything.' " *Id.* In sum, the Seventh Circuit characterized Houghtaling's Omaha confession as "riddled with holes." *Id.*

¶ 165 Next, turning to the evidence concerning the DeCicco group, the court determined that, if the green jacket was removed "from the picture and [we] recognize the holes in the Omaha interview, the DeCicco evidence adds powerfully to the existence of the reasonable doubt we see here." *Id.* at 416. The court noted that DeCicco confessed to five people, two of whom were law enforcement officers; she told friends and family two key facts that police withheld from the public (that the victim yelled into a passing car and that the victim may have sustained a blunt-force injury); she told police in 2006 that the injury was not in newspapers; and the basic facts of her confessions were corroborated by Levand's and Hiland's confessions (who did not have an incentive to falsely confess). The court speculated that, perhaps Levand and Hiland stole and burned DeCicco's car in a field to make their lies more credible, but there was no support for this. *Id.* It further stated that it was notable that DeCicco's family members came forward to police. *Id.*

¶ 166 The Seventh Circuit also addressed Hiland's injuries and the lack of injuries on Houghtaling, noting that, several witnesses testified to seeing Hiland in the days after the shooting and noting his bandaged hand and bruised arms. *Id.* Houghtaling, the court noted, had no injuries and there were no stains on his jacket. *Id.* Addressing the jacket, the court stated that Pardo testified only that the jacket looked like leather. The court examined it and stated that it was made of vinyl and rayon and reasoned that, while "a fair-minded jurist might reasonably conclude that leather could shield someone from physical injuries such as knife cuts or bruises, this conclusion is more tenuous for a jacket with a vinyl exterior." *Id.* at 416-17. Further, the Seventh Circuit criticized this court's analysis of the crime scene, noting that the testimony reflected that Hiland was covered in blood and we were incorrect in our rejection of defendant's characterization of the crime scene as bloody, as evidenced by "grisly photos." *Id.* at 417.

¶ 167 Finally, the Seventh Circuit noted that, although it concluded that we were unreasonable in not holding that the trial evidence failed to support defendant's conviction beyond a reasonable doubt and it did not need to reach the evidentiary errors defendant raised, it chose to address them and to explain why they were prejudicial. *Id.* It addressed three pieces of evidence: (1) Patrick Anderson's testimony about Briseno's cocaine dealing and Levand's knowledge of such, which was "central to the issue of motive," in the court's view, and "vital to [defendant's] defense"[1]; (2)

---

[1]In the third appeal, we rejected defendant's argument that the trial court had erred in excluding Anderson's testimony, which, according to defendant, would have corroborated testimony that the DeCicco group were drug users who had a motive to rob and ultimately kill Briseno. *Smith*, 2013 IL App (2d) 120508-U, ¶¶ 189-92. Anderson would have testified that Briseno was a drug dealer who often had drugs and cash at his restaurant and, one week before his death, Levand learned that there were often drugs and cash at the Burrito Express. We held it was not error to exclude the evidence because it was not entirely

exclusion of Hiland's confession to his friend and roommate, Trumble, who would have testified that he witnessed Hiland confess to a criminal defense attorney, but was excluded by this court on hearsay grounds; and (3) disallowing defendant from further impeaching Pardo's testimony through detective Rhode, which would have revealed additional inconsistencies between Pardo's description of the green jacket on the night of the shooting (black around the collar but no pockets, designs or zipper) and at trial (three large front pockets, a front zipper, a small black patch under the collar, and large black elbow patches); this court held that any error was harmless. *Id.* at 418-20.

¶ 168 The Seventh Circuit reversed the district court, remanded the case with instructions to grant the petition for a writ of *habeas corpus* unconditionally, and ordered defendant's immediate release from State custody. *Id.* at 420.

¶ 169 D. Petition for Certificate of Innocence

¶ 170 On June 29, 2022, defendant petitioned in the circuit court for a certificate of innocence, arguing that: his conviction turned almost exclusively on the uncorroborated and since-recanted testimony of an incentived accuser, Houghtaling; there was no physical or eyewitness evidence tying defendant and his group to the crime; he and his group had no motive to target the Burrito Express; the DeCicco group had a motive to kill Briseno and repeatedly confessed to the murder;

---

consistent with the admitted evidence and because it would have confused the jury as to the proper focus of the trial. *Id.* ¶ 189. We also rejected the argument that it was relevant, where the presence of drugs "at times" was not relevant to the admitted testimony that the DeCicco group allegedly decided to commit a crime to obtain *cash* (to purchase drugs). *Id.* ¶ 190. Finally, in the alternative, we held that any error was harmless because the evidence was circumstantial and cumulative to the direct evidence admitted at trial. *Id.* ¶ 192.

Levand had a motive to kill Briseno and confessed a decade after the shooting to a friend who had told him about Briseno's drug operation; DeCicco confessed to family and friends and law enforcement agencies; and Hiland confessed to a friend, a criminal defense lawyer, a cousin, and other associates. Defendant also asserted that he has maintained his innocence for over 20 years.

¶ 171   The State moved to intervene and object to defendant's petition, arguing that defendant would not be able to prove by a preponderance of the evidence that he is actually innocent and offered no new evidence by way of affidavit, testimony, or physical evidence, and relied on police reports (as opposed to sworn testimony and exhibits) and the Seventh Circuit's analysis of the sufficiency of the evidence (which was irrelevant to whether he was actually innocent).

¶ 172                                    1. Testimony

¶ 173                         a. Defendant's Case - Defendant

¶ 174   A hearing on defendant's petition commenced on October 24, 2023. Defendant, age 47, testified that he was released from prison on May 6, 2021, and lives in Wisconsin. On March 6, 2001, he was 25 years old, lived in Park City, and went to Collett's house in the afternoon to drink alcohol, smoke cannabis, and party. McMullen, his girlfriend, and Houghtaling (whom he had known for a couple of weeks) picked him up, and defendant, Collett, McMullen, and Houghtaling went to Weisenberger's house later in the evening. There were no lights on at his house, so the group left and went to Cloud 9, a head shop they knew about and to which Collett wanted to go. Identification was required to enter Cloud 9. Defendant had a ticket at the time and did not have his identification. Collett, who lived in Spring Grove, was the only person in the vehicle with valid identification. Collett was inside for 15 minutes, and defendant remained in the car. Defendant testified that, to his knowledge, Collett, did not know Weisenberger, who was defendant's best friend, apart from the connection with defendant.

¶ 175   The group went back to Weisenberger's house.  On the way, when they got to the corner of Waukegan Road and Third Street, defendant saw a police car blocking Third Street, halfway between Waukegan Road and Route 120.  The group arrived at Weisenberger's house, McMullen parked her vehicle on the driveway (the car was visible from the street), and they started drinking.  Defendant denied having a gun when he arrived at Weisenberger's house, and, to his knowledge, no one in the car had a gun.  Between Collett's house and Weisenberger's house, there was no discussion about robbing the Burrito Express.  While at Weisenberger's house, Collett and Weisenberger left on two occasions, once to go on foot to White Hen Pantry a few blocks away and once to Jewel in McMullen's car, where they purchased beer.

¶ 176   Defendant testified that he is 5 feet 7 inches tall.  He and Houghtaling are the same height.  On the day of the shooting, he had a mustache and goatee.  He slept at Weisenberger's house that evening, and McMullen took Collett and Houghtaling home.

¶ 177   The next day, detectives arrived at Weisenberger's house to inquire if the group had heard anything the night before.  Defendant went voluntarily and answered questions.  On May 6, 2001, he was arrested.  He never confessed to anyone, denied being present at the Burrito Express on March 6, 2001, denied shooting Briseno, and denied helping plan the robbery and shooting or having anything to do with it.  After the first trial, defendant was offered a plea deal, but did not accept it.

¶ 178   On cross-examination, defendant testified that he met Collett, to whom he was like a big brother, through friends and associates at parties and had known him for about 1 1/2 years up to March 6, 2001.  Collett was 18 years old.  Defendant knew Weisenberger since grade school.  McMullen lived in Round Lake and was defendant's girlfriend; he had known her off and on for about six or seven months as of March 6, 2001.

¶ 179    On March 6, 2001, Houghtaling wore a green down jacket that belonged to Collett.  No one in the group wore a ski mask.  Defendant could not recall any discussions about a robbery, but there were discussions about retail theft (such as a six pack of beer).  They did not go directly from Collett's house to Weisenberger's house, but went to Twin Lakes, Wisconsin, to see Cally Brown, because McMullen wanted to borrow a laptop.  Defendant told detectives that they left Brown's house about 5:30 or 6 p.m.  He denied telling detectives that Collett had a cap gun.  Defendant also identified a polaroid picture of himself as he looked on March 6, 2001 (People's Exhibit No. 2).  On March 7, 2001, at about 11:30 a.m., defendant spoke to police.  He was Mirandized.

¶ 180                                    b. James Weisenberger

¶ 181    Weisenberger, age 45, testified that he lived in McHenry on March 6, 2001, about 100 yards from the Burrito Express, with his home being at the top of a hill from the restaurant.  From his home, he could view the back of the restaurant.  On the evening of the shooting, Weisenberger observed a large police presence at the restaurant.  Defendant, McMullen, Houghtaling, and Collett came to his home after Weisenberger noticed the police presence and the presence of police tape at the scene.  He did not notice anything unusual about the group when they arrived; no injuries, blood, gun, ski masks, or ammunition.  Nor were they acting oddly.  He testified that he and Collett went to White Hen Pantry at one point, walking past an initial police blockade but then turning around and taking another route.  After Weisenberger's identification was refused, he and Collett returned to the house and left to go to Jewel in McMullen's car.  He observed the vehicle's interior, and it was clean, with no visible blood.

¶ 182    At one point in the evening, police knocked on his door, and Weisenberger answered their questions and showed them a storage area behind the house.  Weisenberger had friends in the

police department and learned from them that something had happened at the Burrito Express. He believed that police were looking for a violent criminal, and he tried to be helpful.

¶ 183   Addressing defendant, Weisenberger testified that, on March 6, 2001, he had a mustache and goatee. Early the following morning, police returned to his house, and Weisenberger let them in and answered more questions. They asked him to come to the police station for questioning, and he agreed.

¶ 184   On cross-examination, Weisenberger testified that he has known defendant since seventh grade and they are still best friends. He was first alerted to the police presence at the Burrito Express when his brother told him they were there. He looked down toward the area and saw police vehicles and an ambulance. Weisenberger never heard sirens, gunshots, yelling, or saw cars zooming past his house. He spoke to his mother, who reached out to police officers he knew, and heard something bad was going on at the restaurant.

¶ 185   That evening, Collett, Houghtaling, and defendant smoked cannabis on the front porch. Collett had a cap gun—a small black plastic cap gun with an orange tip that looked like a revolver. The cap gun did not look like a real gun and could not be mistaken for one because it had an orange tip. No one spoke about robbing anyone.

¶ 186                          c. DeCicco's 2005 Quincy Interview

¶ 187   Defendant next presented DeCicco's 2005 interview. In a November 19, 2005, interview at the Quincy police department, DeCicco implicated her group in the shooting, which she stated occurred on March 5, 2001, the day her niece was born. Her sister had gone into labor, and she sent Levand and Hiland to Brummett's house to retrieve a maternity bag. They were gone for 1 1/2 hours and took her car, a silver 2001 Chevy Cavalier. When they returned to the hospital, DeCicco joined them and they went to Ben DeCicco's house. Levand and Hiland fumbled in the

trunk of her car, under where the spare tire would go. There, she saw a towel and a "cowboy gun." She instructed Levand and Hiland to return the gun to her father's house. Levand and Hiland left for 20 minutes, having previously discussed "snatching purses or robbing somebody." They did not take DeCicco's car. There was only one direction they could have gone—down the hill, where there was a White Hen Pantry, a little grocery store, and the Burrito Express. She left in her car and saw Levand and Hiland on the side of the restaurant; she parked/stopped her car by the cleaners. When DeCicco waived to them to come into her car, Levand and Hiland ran inside the restaurant and DeCicco drove toward her home. Before reaching the top of the hill, Briseno, Pardo, Levand, and Hiland darted across the street in front of her. One of the Hispanic men turned around and yelled something into DeCicco's car. She kept driving. When she pulled into her driveway, she heard six pops that sounded like a cap gun. Levand and Hiland arrived when DeCicco was by the side of her house, and Hiland's face was covered in blood. They got into her car, with Hiland in the front seat, saying it was not mine. They went to the Brummetts' home, but stopped at Levand's grandmother's house and threw out a scarf and/or glove that had been cut. Hiland was full of blood, and his hand was cut while one of the men was dragging him back. Levand told DeCicco he was "running away firing *backwards*" (emphasis added).

¶ 188   DeCicco also stated that Levand shot Briseno, Briseno raised a knife to stab Hiland, and Hiland grabbed the knife while Levand struck Briseno in the head with the gun. Levand and Hiland threatened DeCicco not to tell anyone about the shooting. DeCicco told her sister, who told Vicki Brummett. Brummett then contacted the police, who retrieved the Brummett gun. DeCicco identified the Brummett gun as the gun she saw in Levand's hand. When they got into her car after the shooting, Levand put the gun in the *back* seat and Hiland cleaned it. They pulled the guy's (*i.e.*, Briseno's) hair out of it.

¶ 189   DeCicco next related her story about Pechous coming to her cell late at night with his partner and stating that they had arrested the wrong people and that DeCicco's group committed the murder. There was a new detective Brown for the "bad guys"; she did not have to speak to him; and there were rumors he beat the confession out of one of the individuals with a phone book.

¶ 190   She also stated that Levand told her that, when he and Hiland ran into the restaurant, "the guy" threw a knife at them. DeCicco then saw them run out, and she drove to find them. She stopped by the cleaners, and all of them ran in front of her car. She heard six shots fired rapidly in succession; there was no pause. Levand and Hiland ran up through the woods and got into her car. She no longer saw the restaurant employees. Hiland had blood all over him, including on his face. Levand had the gun and threw it in the back seat. She drove to Levand's grandmother's house, and Levand and Hiland disposed of gloves. Next, they drove to the Brummett house. DeCicco stated that she observed that Hiland's hand was cut, but he told her it was not his blood. Hiland had an injury on his palm. The next day, Hiland and Levand burned their clothes. DeCicco believed that Hiland and Levand stole her car and burned it because there was blood on the back seat. They never admitted to doing so, though.

¶ 191                                     d. Vicki Brummett

¶ 192   Vicki Brummett testified that DeCicco had passed away. On March 6, 2001, Brummett lived in Johnsburg, and DeCicco lived in McHenry with her father, about 1/2 mile from the Burrito Express. Hiland also lived with Brummett at this time.

¶ 193   On the night of the shooting, Brummett was at McHenry Hospital, as her daughter, Elizabeth Schwartz had a baby. She left the hospital when it was dark outside and went home. On her way home, she saw police cars around the restaurant. DeCicco, Levand, and Hiland were at

her house when she arrived home. In the days following the shooting, Brummett noticed that Hiland had scrapes on his hands and legs. She did not notice them before the shooting.

¶ 194   In March 2001, Brummett's husband owned a firearm and kept it in their bedroom closet. Brummett spoke to DeCicco about the gun. She suspected that Hiland had accessed the room (first by picking a lock on the door and second through the window). To her and her husband's knowledge, the gun in their room never went missing. At one point, police came and took the gun.

¶ 195   In 2001, Brummett also had a phone conversation with DeCicco about the murder. DeCicco stated that Hiland and Levand waited outside the Burrito Express, and DeCicco pulled up and waived to them to come into the car. However, they ran into the restaurant, then ran out, as someone chased after them and yelled for DeCicco to call the police. DeCicco left and went home. DeCicco also related to Brummett that one man grabbed Hiland and fought with him and that Levand ran and shot the gun *backwards*; he then went up to the man and hit him in the head with the Brummett gun and Hiland escaped. They left the Burrito Express and went to Ben DeCicco's house.

¶ 196   On cross-examination, Brummett testified that Schwartz had her baby on March 5, 2001. She originally misspoke when she stated that she left the hospital on the day the baby was born. Hiland's palms had a road rash, and his legs were scraped on his knees and shin. He stated that he fell on stairs at Ben DeCicco's house because they were icy.

¶ 197   DeCicco had a drug problem in March 2001. DeCicco used heroin for a long time, but Brummett did not know if she used it prior to March 2001. Brummett gave her money. DeCicco lied to Brummett, and her drug use contributed to it.

¶ 198   On re-direct, Brummett stated that she recalled going to the hospital on both March 5 and 6, 2001, and she remembered coming home from the hospital and seeing police cars in the Burrito

Express area. She also recalled, within one week of coming home from the hospital, seeing bruises on Hiland.

¶ 199                                    e. Charlene McCauley

¶ 200   Charlene McCauley, Hiland's sister, testified that, in March 2001, she lived in Johnsburg with the Brummetts, her cousin DeCicco, Hiland, and Levand. While living there, McCauley observed Hiland and Levand go into the Brummetts' room after picking the lock on the door. She heard about the Burrito Express shooting the day after it occurred, as it was on the news. She was at the Brummett residence, and DeCicco, Levand, and Hiland ultimately joined her and Vicki to watch the news. She observed that DeCicco was intensely watching the news and that Hiland had bandages on his hands, wrist, and forearm area. When she asked him what happened, he replied that he fell on the icy steps of DeCicco's father's house. McCauley moved out of the Brummett house in early summer 2001 because she believed the environment was bad, including drugs, alcohol, fighting, violence, and "scary chaos."

¶ 201   In December 2001, a couple days before Christmas, McCauley had a conversation with Hiland about the shooting. He stated that he, DeCicco, and Levand committed the crime. They were at Ben DeCicco's house, smoking crack in the garage. When they ran out of drugs, they decided to rob the Burrito Express to get money. He was shaken up about it and seemed down, overwhelmed, and sad. McCauley did not contact the police about this because she was scared and young.

¶ 202   On cross-examination, McCauley stated that she was 15 years old in March 2001. Hiland is 13 months older than her. Addressing Hiland's bandages, McCauley testified that there was white gauze around his wrist and thumb on both hands. After she picked him up, they drove to the McCauley house. Hiland was initially planning on staying there for a couple of days, but

stayed for six months. He was asked to leave because he brought with him chaos, violence, and drug use. In 2001, DeCicco and Levand used drugs; McCauley observed them smoking pot, taking pills, and "huffing stuff."

¶ 203                          f. Patrick Anderson

¶ 204   Patrick Anderson testified that, in 2001, he lived in McHenry, and Levand was an acquaintance. His sister, Sharon, was friends with DeCicco. Anderson saw Hiland, DeCicco, and Levand hang out together. He observed Levand doing drugs, including cocaine, heroin, and LSD. He also observed DeCicco doing drugs with Levand, and Anderson did drugs with Levand.

¶ 205   Anderson sold drugs to Levand (about 50 or 60 times) and DeCicco. Anderson bought drugs from Briseno about 30 or 40 times. He met him at the Burrito Express in McHenry. Anderson sold some of the drugs he bought from Briseno to Levand and DeCicco.

¶ 206   Within one week of the shooting, Anderson and Levand went to the Burrito Express. Levand wanted to buy drugs from Anderson and, after they went to the restaurant, Anderson had drugs to sell to him. Levand did not enter the restaurant. After Anderson got back into the car, Levand asked why he went to the restaurant and Anderson told him Briseno sold him drugs.

¶ 207   Anderson was incarcerated for about 3 1/2 years (after being sentenced to six years' imprisonment) for delivery of a controlled substance and unlawful possession of a weapon by a felon. (He went to prison in late 2010 and left prison in November 2013.) In 2010, he was incarcerated in the McHenry County jail in the same section as Levand. He had a conversation with Levand about the Burrito Express shooting. Anderson was "razzing" Levand because he suspected that he was involved in the shooting, as they were there one week before the shooting, he was a drug addict who committed crimes to get money to buy drugs, and a mugshot police circulated looked very similar to Levand. In the jail, Levand told Anderson that he committed the

murder with his cousin, whom he did not name. At this time, Anderson considered Levand an acquaintance and knew Levand better than defendant, whom he had met in jail.

¶ 208   Sometime in 2010, while "fighting his case" and prior to his trial, Anderson contacted police through a tip line. However, police did not contact him back. Subsequently, Anderson was found guilty, sentenced, and incarcerated in the Pinckneyville correctional center. He is a certified paralegal and worked as a law clerk in prison. There, he discovered the name of the law firm representing defendant and wrote the firm a letter. Anderson testified that he was charged with home invasion at some point, had nothing to do with the crime, and the State offered him a six-year plea deal, which was a long time in prison. He could not imagine being incarcerated for something he did not do. Anderson denied that his release from prison in 2013 had anything to do with him providing information regarding the Burrito Express murder.

¶ 209   On cross-examination, Anderson testified that he purchased cocaine from Briseno. In March 2001, Anderson knew Levand well enough to take him to the Burrito Express to purchase drugs because Anderson went to behavior disorder school with Levand's brother, Randy.

¶ 210   After the shooting, he found another supplier and purchased heroin, LSD, ecstasy, and Ketamine. After the shooting, he saw Levand once every six months; if Anderson sold drugs, Levand would be with the group he sold to. He sold Levand heroin about five times after the shooting up until 2010. Anderson also used drugs for many years but stopped when he went to prison.

¶ 211   When counsel asserted that Anderson never purchased drugs from Briseno, Anderson denied this. Counsel next asked Anderson if he had a chance to previously testify about this on February 14, 2012, and Anderson replied that the judge would not let him testify about it. However, he was able to testify in 2012 that he purchased cocaine about 20 times from "Serge," a

worker at a Burrito Express location in *Waukegan*. When asked in 2012 if he ever purchased drugs from Briseno, Anderson replied that he *never* did. At the 2023 hearing, Anderson asserted that the court reporter "got it wrong" in 2012 and that he was "shut down" by the trial judge at that time. At the 2012 trial, Anderson was asked if he understood that the drugs Serge sold him came from Briseno, and he replied that he did because there were times that Briseno was present and he spoke to Briseno.

¶ 212   On redirect examination, Anderson stated that his understanding was that, when he purchased drugs from Serge, he was buying from Briseno.

¶ 213                                  g. Roger Trumble

¶ 214   Roger Trumble lived in Spring Grove in 2001 with Christopher Schwartz, a childhood friend and DeCicco's brother. In summer or fall of 2001, Hiland's father shot and killed his mother and Hiland (Christopher's cousin) came to live with Trumble.

¶ 215   During the time Hiland lived with Trumble, they had a conversation ("at different times") at the kitchen table about the Burrito Express shooting. Christopher was also present.

¶ 216   According to Trumble, Hiland stated that he, DeCicco, and Levand committed the crime. Trumble believed Hiland because Hiland, who was 16, "was pretty upset." He was afraid, shaking, crying, and a "scared boy." Also, his voice cracked. Hiland related that the group planned to rob the Burrito Express but something went wrong when one of the employees pulled a knife and Levand pulled out a gun and shot him. Trumble and Hiland had been drinking during this conversation.

¶ 217   Trumble contacted a criminal defense attorney he knew because he believed Hiland told the truth and was afraid he had thrown his life away and needed an attorney. (Trumble was 26 years old at this time.) He told Hiland that, if he was involved in the crime, he needed an attorney,

but Hiland did not have the means to hire an attorney. Trumble contacted attorney Ed Edens and arranged a meeting. Trumble, Hiland, and Edens met at a Lake Zurich restaurant. Hiland repeated the story he had told Trumble and stated he, Levand, and DeCicco were involved in the murder. During the ride home from the meeting with Edens, Hiland told Trumble that he was not going to do anything because someone had been arrested. Trumble did not contact police because he was afraid of Levand, the police, and the prosecutor. Trumble felt protective toward Hiland.

¶ 218 On cross-examination, Trumble testified that, while Hiland lived with him in 2001, Hiland used marijuana and alcohol and Trumble allowed him to do so. During the kitchen table conversation, Trumble, Hiland, and Christopher were drinking, using cannabis, and they were not sober. Trumble contacted the attorney the following day. The meeting with the attorney took place about three days later. Hiland was sober during the meeting, as was Trumble. The defense attorney never represented Hiland.

¶ 219                    8. Video of 2021 McMullen Interview

¶ 220 A video of a March 25, 2021, interview of McMullen was admitted into evidence. In the video, McMullen stated that, on the night of the shooting, defendant's group decided to go to Weisenberger's house after they left Wisconsin. Defendant drove. On the way into McHenry, they saw lights and switched drivers to McMullen because defendant was concerned about his license status. They stopped at Cloud 9, Collett went inside for 15-to-20 minutes, and then the group went to Weisenberger's house. Lights from the Burrito Express were visible through a back window. McMullen slept there and left about 7 a.m. the following morning with Houghtaling to go to Round Lake Beach.

¶ 221 One day later, detectives arrived at her house and asked questions about the shooting. Later, she was interviewed and denied involvement in the shooting. On a third occasion, detectives

asked if she would submit to a polygraph examination, and she agreed. She was urged to take, and took, one of her medications—Klonopin; she was medicated because she had lost a pregnancy. At the time, she was also on depression and sleep medications. Afterwards, detectives took her to the police station, where she viewed the Cloud 9 surveillance video and identified Collett. Next, she was escorted to an interrogation room, and detectives Wigman, Brogan, and Jones were present. Wigman, who conducted the questioning, screamed at her when she denied involvement in the shooting, stated that if she said defendant's name she could go home, and told her what to say. She "felt trapped." Wigman also wrote the names of streets and descriptions of the gun. McMullen said what they wanted her to say. Later, detectives recorded her statement, stopping the tape if she did not get something right. The medication caused her to be "in and out." She awoke in a jail cell the following morning. McMullen did not realize she had given a false statement.

¶ 222 McMullen denied that there was any conversation on Weisenberger's porch while defendant's group was at his home. She also could not recall crying when the polygraph examiner told her she needed to tell the truth.

¶ 223 Defendant attached to his petition a copy of McMullen's May 11, 2001, confession. There, she initially denied going to Cloud 9, but also stated, when asked if it did not happen, "Not for like later if they went." McMullen related that, on the way into McHenry, defendant showed her a gun and he wore it in his belt. Also, the men made comments about getting some money. Collett stated they should go to Jewel to rob the store, but defendant told him to shut up. The three men exited her car after they arrived in McHenry. She did not see where they went, she heard commotion and yelling after a few minutes, saw Houghtaling run behind her car and across to the woods, and then heard shots fired. After the men returned, the group went to Weisenberger's house. At his house, defendant told McMullen that he shot someone; he did not want to, and it had something to do

with "coke and a drug deal"; defendant stated that the owner was a "big drug dealer." The three men later had a conversation on the porch and did not want anyone else to be on the porch. Later during the evening of the shooting, Collett and Houghtaling want out again to obtain cigarettes. Defendant was later picked up on a warrant and called McMullen from McHenry County jail on March 8, 2001. He told her not to tell anyone he left the house. The next day, he called again, stating not to tell police he left the house or "I'll make your life [a] living hell. Don't fuck me over."

¶ 224   McMullen further stated in 2001 that, when the men returned to her car, she observed a cut on the left side of Houghtaling's face; he also had a mask. Addressing the shots she heard, she specified that she first heard two shots, then another, and then "there was a sequence of more" for a total of about five. She estimated that defendant was 5 feet 7 inches tall.

¶ 225                                    8. State's Case

¶ 226   The State asked the court, and the court agreed, to take judicial notice of the testimony from all three of defendant's trials and the exhibits from the third trial. It also presented a video of a June 6, 2007, interview of McMullen, in which she implicated defendant's group. In the video, McMullen stated that, on the day of the shooting and before defendant's group drove to Wisconsin, defendant showed McMullen a gun in his waistband; it was all black with a slight blueish tint. On the way back to McHenry from Wisconsin, Collett had a "fake revolver"/"toy gun" and made statements about robbing a store, and defendant told him to be quiet. In McHenry, defendant instructed McMullen to turn right onto Third Street, drive down the hill, and make a U-turn to turn into the lot for Don's Cleaners. Defendant looked at Houghtaling and stated, "Let's go." They exited the car. (McMullen suspected they were going to rob someone.) Subsequently, McMullen heard a commotion, moved her car, and saw two men fighting. She then saw

Houghtaling run behind her car and heard two gunshots from where Houghtaling had run. Less than one minute later, she heard more gunshots. A few minutes later, defendant and Houghtaling returned and got into McMullen's car. Defendant instructed McMullen to drive to Weisenberger's house. There, defendant told McMullen that he had shot someone and that the restaurant owner had cocaine. She also saw Houghtaling holding a ski mask at Weisenberger's house. About five minutes later, Weisenberger saw police lights by the Burrito Express.

¶ 227 Defendant instructed McMullen to contact her mother and tell her that she would not be home that evening. He also told her not to come out on the porch when defendant's group was out there at one point. McMullen slept at Weisenberger's house that evening. The following morning, around 7 or 7:30 a.m., she left with Houghtaling and Collett. After dropping off Collett, Houghtaling stated to McMullen that "things were messed up" and "he couldn't believe it."

¶ 228 Defendant was subsequently picked up on a warrant and then called McMullen from jail. He asked her if police had contacted her, and she told him they had. He instructed her not to tell them anything or he "would fuck [her] up." During a second conversation, defendant instructed McMullen not to say anything about him and Houghtaling leaving her car and to tell police that they went to Cloud 9 and then to Weisenberger's house; he threatened her if she did not follow his instructions.

¶ 229 Addressing Cloud 9, McMullen denied that she or defendant's group went to the shop on the evening of the shooting, but stated that, at one point while defendant's group was at Weisenberger's house, Collett and Weisenberger left in her car to go get beer.

¶ 230 The State rested.

¶ 231                                   2. Circuit Court's Ruling

¶ 232   On December 20, 2023, the circuit court denied defendant's petition.  It noted that the only contested issue was whether defendant was innocent of the charged offenses, and it found that he failed to prove by a preponderance of the evidence that he is innocent of the charges.  The court noted that, to accept defendant's theory, it had to disregard incriminating statements made by his co-defendants Houghtaling, McMullen, and Collett.  Further, it had to accept defendant's description of the shooting as first posed by DeCicco: that the shooter, while running away from Briseno and Pardo, fired a single-action .22-caliber revolver over his shoulder toward Briseno in rapid succession.  "This requires the shooter to cock the hammer of the gun before each shot is fired."  The court also noted that it would have to disregard Pardo's description of the shooting.  Specifically, although he did not identify the two men, he provided a description to a sketch artist.  "The sketch of the accomplice *strongly* resembles the photo of Justin Houghtaling as he appeared in the green jacket he was wearing on the night of the murder."  (Emphasis added.)  Pardo was certain that the shooter started firing shots while approaching himself and Briseno as they dragged the accomplice back to the restaurant.  Pardo, the court further found, was credible, with no bias or interest not to testify truthfully.

¶ 233   Turning to Collett, the court noted that he gave two different versions about how he arrived at Cloud 9: walking there and walking back to McMullen's car after walking up the hill to see if Weisenberger was home.  "If he did go back to the car[,] then two occupants were in the white car before [defendant] and Houghtaling came back after the shooting."

¶ 234  Next, addressing Houghtaling's Omaha confession, the court found incredible and unsupported by the evidence defendant's argument that Houghtaling was under the influence of drugs during the interview and so it should be given no weight.  The court noted that Houghtaling was in police custody for about six hours before he was questioned and that detective Brogan

testified that he observed no signs of impairment. The court also found sincere Houghtaling's apology to Briseno's family. Addressing his recantations, the court found the "combative and argumentative way he testified" reflected that Houghtaling was frustrated with the State, "as he could not get a better deal than he originally accepted." His claim that he was offered money for his testimony was incredible, the court found, and his letter to McMullen inferred his Omaha confession resulted from being beaten with a phone book, which reflected he was frustrated with the State and acting on it.

¶ 235 Addressing DeCicco, the court noted that she had a silver car and McMullen had a white vehicle at the time of the shooting. Pardo, the court further noted, testified he observed a white car and testified that Briseno stopped to talk to a car's occupants (specifically, "them"). It also noted that DeCicco ultimately recanted her statements implicating herself and her group, her statements over the years were inconsistent, and her description of the shooting did not match Pardo's description (in different versions, she stated the shooting occurred on either March 5 or March 6, 2001; Levand told her he fired the gun over his shoulder as he ran away from Briseno; and Levand told her the guy threw a knife at him). Also, Vicki Brummett testified DeCicco was a drug addict and lied to her.

¶ 236 The court noted defendant's inconsistent statements, where, in a March 7, 2001, interview, he stated the group stopped at Cloud 9 on the way back to town before going to Weisenberger's house. The Cloud 9 video showed Collett inside at 7:38 p.m. If this version was true, the court noted, it was an alibi based on Collett's presence at Cloud 9 at that time. (Briseno was murdered at 7:21 p.m.) However, at the hearing on the petition for a certificate of innocence, defendant testified that the group first went to Weisenberger's, he was not home, and then they went to Cloud 9, which meant they were at the Burrito Express sometime before 7:38 p.m.

¶ 237 The court also found that the record contradicted defendant's testimony at the certificate-of-innocence hearing that he refused any plea deal, noting it was the trial judge who refused to accept the plea deal (as stated in her November 2, 2007, order).

¶ 238 Addressing McMullen's statements, the court noted that, in her 2001 confession, she corrected an earlier statement about going to Cloud 9, stating, when asked if that did not happen, "Not for like later if they went." In her 2007 interview, she implicated defendant's group, denied they went to Cloud 9, but stated she gave her car keys to Collett and Weisenberger. Finally, in 2021, after the federal district court granted defendant's *habeas* petition and while she was no longer in custody, McMullen asserted that her 2001 confession was a false confession.

¶ 239 As to Brummett, the court noted that she testified in 2012 that she could not say if the gun was ever removed from her house before police confiscated it, and DeCicco never saw Hiland and Levand remove or return the gun to the house. She also testified that to her and her husband's knowledge, the gun *never* went missing from their house. Brummett, the court further noted, testified about injuries she observed on Hiland (rash on palms and scrapes on knees and shins), but this contradicted statements by others that Hiland received a cut on his hand from Briseno's knife. At the certificate-of-innocence hearing, the court further noted, Brummett testified that Hiland said he fell on Ben DeCicco's stairs (and he made this statement to others, it noted).

¶ 240 In summary, the court found that the proceeding did not include the presentation of any newly-discovered evidence and no forensic evidence tied either group to the crimes. It found that (1) the sketch strongly resembled Houghtaling; (2) there was no competent evidence from which to find Houghtaling's Omaha confession was false; (3) he made a sincere apology to the Briseno family, thereby, admitting his role in the shooting; (4) McMullen, Houghtaling, and Collett made statements placing defendant at the scene; (5) there was evidence that defendant made statements

in the car after the shooting and to McMullen at Weisenberger's house, implicating himself; (6) DeCicco's statements implicating Levand and Hiland were not credible and it was more likely that she fabricated the her story about the shooting; and (7) defendant's statements, including to police, that Houghtaling was not present on March 6, 2001, may have contributed to his conviction.

¶ 241   The court acknowledged there was evidence pointing the DeCicco group, but, putting aside DeCicco's credibility, the court determined that: Hiland spoke to others about the murder (or at least about DeCicco's version of events); he met with an attorney (but the court would not speculate about its true purpose); the burning of DeCicco's car was suspicious (but no evidence corroborated it was burned to hide evidence, and no evidence reflected that Levand and Hiland were responsible for the theft and burning); and no competent evidence reflected that Briseno's head wound was caused by the Brummett gun.  The court also found that, although Briseno's head injury and the call out to the car were not made public by police, the evidence supported a finding that Briseno called out to a white car, not a silver one.  Hiland's statements and the assertions regarding the head wound and Briseno's call out to the car allegedly occupied by DeCicco, it further determined, were outweighed by the evidence implicating defendant's group.  Defendant appeals.

¶ 242                                II. ANALYSIS

¶ 243  Defendant argues that, in denying his petition, the circuit court misapprehended the evidence, including considering exonerating evidence as incrimination and vice versa, ignoring evidence of defendant's innocence, and ignoring evidence of the DeCicco group's guilt and mounds of corroborating evidence.  For the following reasons, we reject his arguments.

¶ 244                             A. Preliminary Matter

¶ 245 Preliminarily, the State argues that defendant's statement of facts is argumentative and contains material omissions of fact and requests that we strike or disregard it. Illinois Supreme Court Rule 341(h)(6) requires statements of facts to "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). The State includes a supplemental statement of facts in its brief. Ill. S. Ct. R. Rule 341(i) (eff. Oct. 1, 2020) (a statement of facts "need not be included" in an appellee's brief "except to the extent that the presentation by the appellant is deemed unsatisfactory" by the appellee).

¶ 246 We deny the State's request to strike defendant's statement of facts, but we will disregard any argument therein or "facts" not supported by the record. Further, we admonish defendant that our supreme court rules "are not advisory suggestions, but rules to be followed." *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57.

¶ 247                  B. Statutory Requirements for Certificate of Innocence

¶ 248 Section 2-702(b) of the Code provides that:

> "[a]ny person convicted and subsequently imprisoned for one or more felonies by the State of Illinois which he or she did not commit may, under the conditions hereinafter provided, file a petition for certificate of innocence in the circuit court of the county in which the person was convicted. The petition shall request a certificate of innocence finding that the petitioner was innocent of all offenses for which he or she was incarcerated." 735 ILCS 5/2-702(b) (West 2022).

¶ 249 In order to obtain a certificate of innocence under section 2-702 of the Code, a petitioner must prove by a preponderance of the evidence that:

"(1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

(2)(A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; ***;

(3) the petitioner is innocent of the offenses charged in the indictment or information ***; and

(4) the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction." *Id.* § 2-702(g).

¶ 250 The proceeding is civil in nature, and the burden is on the petitioner to prove the requirements to entitle him or her to such relief by a preponderance of the evidence. *People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 44. "A proposition is proved by a preponderance of the evidence when the proposition is more probably true than not true." *People v. Love*, 404 Ill. App. 3d 784, 787 (2010); *Lindsey v. Board of Education of the City of Chicago*, 354 Ill. App. 3d 971, 986 (2004).

¶ 251 "If the court finds that the petitioner is entitled to a judgment, it shall enter a certificate of innocence finding that the petitioner was innocent of all offenses for which he or she was incarcerated." *Id.* § 2-702(h). A person who secures a certificate of innocence may file a petition in the state's Court of Claims seeking compensation. *Rodriguez v. Cook County, Illinois*, 664 F.3d 627, 630 (7th Cir. 2011) (citing 735 ILCS 5/2-702(a) (West 2008)); see also *Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993) ("[a] certificate of innocence serves no purpose other than to

permit its bearer to sue the government for damages"). Where a petitioner obtains a certificate of innocence, it is "all but certain that the petitioner can obtain a money judgment against the State for wrongful incarceration." *People v. Moore*, 2020 IL App (1st) 190435, ¶ 37.

¶ 252 In any hearing on a petition for a certificate of innocence, the circuit court "must consider the [supporting] materials attached to the petition" (*Hood*, 2021 IL App (1st) 162964, ¶ 23) and "may take judicial notice of prior sworn testimony or evidence admitted in the criminal proceedings related to the convictions which resulted in the alleged wrongful incarceration" (735 ILCS 5/702(f) (West 2022)).

¶ 253 Here, the only issue is whether defendant proved his innocence of the charged offenses by a preponderance of the evidence. The fact that the Seventh Circuit disagreed with our resolution of the sufficiency-of-the-evidence issue is not dispositive of this issue. See *People v. Pollock*, 2014 IL App (3d) 120773, ¶ 37 (explaining that "the Code contemplates the differences between actual innocence and a finding by a court of review that no rational jury could find beyond a reasonable doubt that the State proved all elements of the crimes charged"); see also *People v. Terrell*, 2022 IL App (1st) 192184, ¶¶ 21, 67 (affirming a trial court's finding that a petitioner failed to prove his innocence, even though the convictions had been overturned on direct appeal based on insufficient evidence that he constructively possessed drugs and weapons).

¶ 254                           C. Standard of Review

¶ 255 Defendant asserts that the manifest-weight-of-the-evidence standard of review applies to the review of a ruling on a petition for a certificate of innocence, but acknowledges the split of authority on the issue. See *People v. Washington*, 2023 IL 127952, ¶ 47 (acknowledging split but declining to decide appropriate standard because the outcome in the case before court was the same

regardless of whether the manifest-weight or abuse-of-discretion standard applied).[2] In any event, defendant concludes his opening brief by asserting that, under any standard or review, the circuit court's ruling was erroneous. The State, noting precedent in this court (see, *e.g.*, *People v. Green*, 2024 IL App (2d) 220328) and certain statutory language (735 ILCS 5/2-702(a) (West 2022)), advocates for the abuse-of-discretion standard, but also argues that, under either that standard or the manifest-weight standard, the result would be the same in this case. A finding is against the manifest weight of the evidence where the finding is arbitrary, unreasonable, or not based on the evidence. *People v. Cardona*, 2012 IL App (2d) 100542, ¶ 36. A court abuses its discretion where "no reasonable person would agree with the position adopted by the trial court." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). We agree that, under either standard, the result would be the same in this case.

¶ 256 Defendant also asserts that, when a circuit court misapprehends the material relevant facts, a reviewing court owes no deference to its determination and that was the case here. See, *e.g.*, *People v. Williams*, 2013 IL App (1st) 111116, ¶ 103 ("with a claim of mistaken recall, the record contains affirmative evidence that the trial court made a mistake in its decision-making process, thereby undercutting the presumption that serves as the very foundation for the deferential standard of review in an insufficient evidence claim-that the trial court accurately recalled and considered all the evidence"). As we conclucde below, the circuit court did not misapprehend the material relevant facts. Thus, we reject defendant's assertion that we must apply *de novo* review.

---

[2] In *Washington*, a four-member majority of our supreme court declined to resolve the split. In a special concurrence, three justices opined that the proper standard of review is whether the judgment is against the manifest weight of the evidence. *Id.* ¶ 70 (Rochford, J., specially concurring, joined by Theis and Overstreet, JJ.).

¶ 257          D. Whether the Circuit Court Misunderstood Material Facts

¶ 258  Defendant argues first that the circuit court's denial of his petition for a certificate of innocence was erroneous because the court misapprehended the facts.  Specifically, he contends that the court denied his petition under the erroneous belief that: (1) Pardo, the sole eyewitness, did not see the perpetrators' faces; (2) defendant had not presented evidence regarding the purpose of Hiland seeing an attorney; and (3) the perpetrator fired shots in rapid succession.  Defendant maintains that, accurately viewing the record, these facts supported his bid for innocence.

¶ 259          1. Whether Pardo Saw The Perpetrators' Faces

¶ 260  Defendant asserts that Pardo saw the perpetrators' faces during the shooting and, after viewing defendant's and Houghtaling's photos in a photo lineup two days later, told police that defendant and Houghtaling were not the perpetrators.  This is highly indicative, defendant argues, of innocence.  However, the circuit court believed that Pardo had not seen the perpetrators' faces and, thus, disregarded the fact that Pardo did not identify defendant and Houghtaling in the photo array.  Defendant maintains that this was incorrect, as Pardo consistently testified that he saw the perpetrators' faces and worked with a sketch artist to produce a composite that the court compared to Houghtaling's photograph.  Defendant also asserts that the court omitted that Pardo was shown Houghtaling's photo two days after the murder and did not identify him as one of the perpetrators (and did not identify photos of defendant and Collett).  Defendant further argues that the circuit court credited its own belief that Houghtaling looked like Pardo's composite drawing of the accomplice and rejected Pardo's testimony that Houghtaling (and defendant and Collett) was not guilty.  There is no way to square, he urges, the court's reliance on Pardo's sketch as evidence of the accomplice's appearance while simultaneously ignoring Pardo's performance in the identification procedure shown to him two days after the murder.

¶ 261    We reject defendant's argument that Pardo's failure to identify defendant or Houghtaling from the photo array constitutes strong evidence of innocence. We will not speculate as to why Pardo could not identify the men, but it is significant, as the circuit court found, that Pardo provided information that resulted in a sketch that bears a striking resemblance (as we noted in our analysis of the sufficiency of the evidence) to Houghtaling (and not to Hiland) and a sufficient resemblance to defendant. Indeed, the photo of Houghtaling reflects a distinctive hairline and facial features that are also present in the sketch that resulted from Pardo's description.

¶ 262    We also reject defendant's argument that the circuit court's findings reflected that it was under the mistaken belief that Pardo never saw the assailant's faces. The court found that, during the struggle with the accomplice, Pardo pulled off the assailant's mask, "but did not see any facial characteristics. Pardo stated all he really saw was a silhouette and the area was dark, without light." We cannot conclude that the court misinterpreted the record. Pardo testified through an interpreter and, as to the man in the green jacket, stated that he saw his face for two seconds, getting a good look at his face and then stating specifically that he observed the man's "silhouette" and his facial features. He also stated that it was dark outside. Thus, the circuit court's findings reflect the somewhat-vague answers Pardo gave concerning his observation of the accomplice. Regardless, as noted, the sketch from his description of the assailant bears a striking resemblance to Houghtaling and is a significant piece of evidence pointing to defendant's group. Pardo's failure to identify defendant or Houghtaling from the photo array, we noted on direct appeal, was known to the jurors, as was the fact that the sketch did not show facial hair, and the jury weighed this evidence, along with the fact that it was dark out and that defendant's face was visible only when he was about 25 to 30 feet away.

¶ 263                2. Hiland's Confession to a Criminal Defense Attorney

¶ 264   Next, defendant argues that the circuit court mistakenly believed that the record was silent about Hiland's confession to a criminal defense attorney and, thus, ignored Hiland's extremely probative confession.   The court, defendant asserts, mistakenly believed that Trumble did not attend the meeting and used that as a basis to discount Hiland's confession.   That is, because Trumble did not attend the meeting, the court surmised, there was no evidence as to its true purpose.   The court avoided, according to defendant, grappling with the consequence of Hiland confessing to a criminal defense attorney by misstating the facts.   The court, defendant argues, got it wrong.   Trumble attended Hiland's attorney meeting and reported that Hiland discussed his role in the murder while consulting with the lawyer.   Thus, there is no need to "speculate," he asserts, as to the nature of the meeting because the full circumstances of the meeting were placed in evidence by Trumble.   Defendant also maintains that the meeting was extremely significant to Hiland's confession's credibility.   He discussed his culpability in Briseno's murder with a criminal defense attorney.   The only inference to be drawn from the uncontroverted facts, he argues, is that Hiland confessed to participating in the murder with Levand and DeCicco.   This evidence alone, he asserts, was sufficient to turn the tide for defendant, but, in conjunction with the overwhelming evidence corroborating Hiland's confession, it is undeniable that the circuit court erred in denying defendant's petition.

¶ 265   The circuit court found that "Trumble did not participate in the meeting with the lawyer." It also found that Hiland spoke with others about the murder/DeCicco's story and met with an attorney, "but the court would have to speculate as to the true purpose of the meeting and this court chooses not to speculate on this issue."

¶ 266   At the third trial, defendant presented Trumble's testimony that, while living with Hiland in the summer of 2002, Hiland, while shaking and crying, confessed to participating in the Burrito

Express shooting. During a second conversation at a restaurant a few days later, Hiland was sober and upset and told Trumble about a shooting, emphasizing that Levand was the shooter. Finally, during a third conversation on the way home from the restaurant, Hiland told Trumble that, since someone else was arrested, he was not going to do anything. At the hearing on defendant's petition for a certificate of innocence, Trumble again related a kitchen confession by Hiland, who was not sober, which he stated prompted him to contact a criminal defense attorney he knew. Trumble testified that he and Hiland met the attorney at a restaurant and that Hiland repeated the story that he, Levand, and DeCicco were involved in the murder. The attorney never represented Hiland.

¶ 267 We disagree that the fact that the circuit court mistakenly believed that Trumble did not attend the meeting and used this as a basis to discount Hiland's confession rendered erroneous its denial of defendant's petition. As the foregoing reflects, the court's findings were that Hiland confessed/repeated DeCicco's story about the murder and met with an attorney. Trumble explained that Hiland confessed to the attorney. We believe that the court's statement that it would not speculate as to the meeting's purpose merely reflects, in part, the absence of evidence concerning the substance of the attorney's statements to Hiland. The court acknowledged Hiland spoke to others about the murder, but found that this and other evidence pointing to the DeCicco group (*i.e.*, the assertions regarding Briseno's head wound and Briseno's call out to the car allegedly occupied by DeCicco) were outweighed by the evidence implicating defendant's group. Whether or not Trumble was present at the meeting had no bearing on this consideration.

¶ 268                           3. DeCicco's Confession

¶ 269 Next, defendant argues that the circuit court erroneously believed that DeCicco's confession was physically impossible. Specifically, the court refused to credit DeCicco's confession, erroneously believing that her statement that Levand fired *over his shoulder* was

physically impossible because the Brummett revolver was a single action revolver, the shots were fired in rapid succession, and Pardo described the shooter approaching Pardo and firing his weapon, not firing as he ran. Defendant asserts that, based on these misunderstandings, the court discredited DeCicco's confession implicating Levand.

¶ 270 Specifically, defendant first argues that there is nothing in the record suggesting anyone said the shots were fired in rapid succession (as a single-action revolver needs to be cocked before being fired and it was implausible that Levand, as the court reasoned, could have fired a single action revolver in rapid succession). Neither DeCicco nor Pardo stated the shots were fired in rapid succession. Second, defendant argues that the court correctly noted that Pardo saw the shooter fire as he was approaching but ignored that there was also a time when the shooter fired from a location Pardo did not observe (referencing Pardo's 2003 testimony that he heard a shot while he was in the area behind Sullivan's Foods). Thus, defendant reasons, nothing rebutted DeCicco's account that Levand, while running away from Briseno, fired a shot over his shoulder. But the court used its misimpression of the facts to discredit DeCicco's confession, improperly finding it was contradicted by the physical evidence. In fact, defendant asserts, the physical evidence supported DeCicco's confession: she identified the murder weapon as a revolver, which has the same number of widths of lands and grooves as found on the bullet recovered from Briseno, and her confession included facts not known to the public, such as the fact that the victim was struck in the head and yelled to a nearby car.

¶ 271 We reject this argument, as the record rebuts defendant's assertion. There was evidence at trial that the shots were fired in rapid succession. Rosenberg, a neighbor who lived on Waukegan Road near the Burrito Express, testified in 2012 that, shortly after 7 p.m. on the night of the shooting, she heard a "pop," men shouting, another "pop," and then four pops "in a row." She

believed the pops to be the sound of gunfire and went to call the police, before seeing that a police car was already going down Third Street toward the restaurant.

¶ 272          E. Whether the Circuit Court Ignored Additional Evidence of Innocence

¶ 273   Next, defendant argues that the circuit court ignored additional overwhelming evidence of his innocence.

¶ 274                    1. Whether Houghtaling's Confession Was False

¶ 275   Defendant first argues that the circuit court erroneously found that there was no evidence that Houghtaling's confession was false.  He maintains that Pardo's account contradicted Houghtaling's confession.  Houghtaling did not know how many people were in the restaurant, did not know if he was wearing a ski mask, stated that they went to the counter area rather than inside the kitchen, and did not know Pardo was chasing them eastbound and that he ran around Don's Cleaners.  Houghtaling, defendant further asserts, did not know how he was grabbed from behind, that Briseno was shot, or that he was ever held by Briseno after Briseno was shot. Houghtaling stated that, upon being let go by the person holding him, he ran away.  Pardo released the man in the green jacket, defendant notes, but then watched as Briseno held onto the accomplice.

¶ 276   Defendant also argues that the physical evidence contradicted Houghtaling's confession, where Houghtaling did not know that Briseno had suffered any injuries, despite being grabbed by the victim after being shot.  He also could not account for how Briseno suffered the head wound despite supposedly being in his grasp at the time.  Houghtaling also could not identify the murder weapon, defendant argues, picking the semi-automatic weapon as the one used in the commission of the crime.  Houghtaling also appeared at the police station the day after the murder, wearing the green jacket he supposedly wore the prior day, and no blood was discovered on the jacket and

Houghtaling himself had no visible signs of injury despite being dragged across a parking lot by two men.

¶ 277   Further, defendant argues that investigators asked many leading questions during the Omaha interrogation, and the circuit court disregarded this.  The problem for the confession's reliability, defendant asserts, is that, despite being fed information during his interrogation, Houghtaling still got numerous critical details wrong.  He also points to the Seventh Circuit's statement that Houghtaling could not provide a single detail corroborating his account that was not already known to *police*.  *Smith*, 996 F.3d at 415.  Instead of acknowledging the inconsistencies in the confession, defendant asserts, the court focused on Houghtaling's apology at his sentencing hearing and dismissed his recantations at later trials, finding that he was mad and wanted a better deal.  He even pleaded guilty to perjury, defendant notes, and was sentenced to more than five additional years' imprisonment for testifying to defendant's innocence.

¶ 278   Finally, defendant argues that Houghtaling wore a different jacket than the jacket described by Pardo.  He notes that, on the night of the murder, Pardo told police that the green jacket had black around the collar, had no pockets or designs or a zipper on the front.  Houghtaling's jacket, however, had multiple pockets, designs, and a zipper, and his collar was green (with no black on it).  Defendant asserts that it was not until 2012, after defendant had been twice convicted, that Pardo claimed the jacket possibly did "look like" the one he saw on the man during the shooting.  Defendant takes the position that it is implausible that Houghtaling's green jacket was the same jacket worn by the robber, as it lacked blood and he voluntarily wore it to the police station the day after the murder.

¶ 279   We find defendant's arguments unavailing.  Houghtaling confessed in Omaha *before* any plea deal.  In that confession, he stated, without suggestion, that defendant carried a "little .22"

(which was consistent with the type of gun the police believed was used in the shooting), he stated that his jacket was green (consistent with Pardo's testimony), and the sketch produced from Pardo's description of the man in the green jacket bears a striking resemblance to Houghtaling. Further, Houghtaling's statements were corroborative of Pardo's testimony. Houghtaling stated twice (in Omaha and at McMullen's trial) that defendant entered the restaurant first and carried the gun; this was consistent with Pardo's testimony that the man with the gun entered first and the man in the green jacket followed him. Houghtaling also stated in three statements (albeit, the first time in Omaha, in response to a leading question) that he and defendant concealed their faces and twice stated (at defendant's second trial and McMullen's trial) that they wore ski masks. This was consistent with Pardo's testimony that the men wore masks covering all but their eyes. Houghtaling also testified three times that defendant announced the robbery after he and Houghtaling entered the Burrito Express; this was consistent with Pardo's statement that the man with the gun stated something in English to Briseno, which resulted in Briseno raising his knife and chasing them out of the restaurant. (Houghtaling also related the chase in his statements.) During the Omaha interview, Houghtaling was asked whether he ran toward the busy street or the side street and he responded, without suggestion, that he ran toward the side street, which was consistent with Pardo's testimony that he chased Houghtaling across Third Street. At both McMullen's trial and defendant's second trial, Houghtaling testified that he fell on ice and that one of the men caught him. This testimony was consistent with Pardo's statement that the man in the green jacket fell on ice. Houghtaling also related in three statements that he was caught while defendant was outside his view and that defendant later came into view and fired shots. Pardo similarly testified that he ran in front of a nearby dry cleaners and that Briseno ran behind it and, at one point, he could see only the man in the green jacket, with whom he caught up after the man

slipped and fell on ice. Pardo testified that he did not again see the man with the gun until he had reached Third Street (while he was dragging the man in the green jacket).

¶ 280 We addressed the investigators' leading questions on direct appeal and noted, again, that Houghtaling mentioned several facts about the shooting without suggestion from police. That the facts may have been known to police is not relevant. What is significant is that he provided some material information without the prompt of leading questions.

¶ 281 Finally, as to the green jacket, Pardo's description was sufficiently similar to the jacket Houghtaling wore, especially given the testimony that it was dark outside and the area outside the Burrito Express was not well lit. Regardless, the sketch produced from Pardo's description, again, bore a striking resemblance to Houghtaling and not to Hiland.

¶ 282        2. Whether DeCicco's Confession Was Supported by Physical Evidence

¶ 283 Next, defendant argues that DeCicco's detailed and factually-supported confession constituted powerful evidence of his innocence. Her confession, he maintains, was corroborated by Pardo and the physical evidence. The court, defendant asserts, provided few details to support its finding that DeCicco's confession differed in many details from Pardo's, and it cast aside many parallels in their accounts.

¶ 284 Defendant notes that DeCicco confessed to her mother, Vicki Brummett, in November 2001. She included that fact that Levand struck the victim with the gun. This confession prompted Vicki Brummett to contact police and provide them with the Brummett gun. Defendant further notes that DeCicco gave a tear-filled confession to law enforcement in 2006. The circuit court, defendant argues, mistakenly believed that DeCicco's account of Levand running and firing the gun was contradicted by the evidence. It also took issue with DeCicco recalling that the murder took place on March 5 instead of March 6, 2001; that Levand told her Briseno threw a knife at

him; and she stated she saw the gun when Levand and Hiland were fumbling around in the trunk of her car but then changed some details. Defendant maintains that no contradictions exist.

¶ 285 DeCicco, he notes, conceded that the date could have been March 5th or 6th. He also maintains that nothing in the record disputes DeCicco's account that Briseno threw a knife at Levand, particularly if it was thrown when Levand approached to pistol-whip Briseno. Also, the knife was found near Briseno, but there was no testimony as to how it ended up near him. Defendant also argues that there were no contradictions between DeCicco's November 2005 and January 2006 statements about when she first saw the gun: on the day of the murder, she first saw the gun in the trunk versus stating that she had seen the gun before at her mother's house.

¶ 286 We disagree with defendant that DeCicco's confession provided powerful evidence of his innocence and that the circuit court erred in discounting it. Preliminarily, DeCicco's statements concerning Pechous and a detective Brown cast serious doubts on her credibility and, thus, her confessions. In both her 2005 and 2006 confessions, she related that detective Pechous came to her jail cell one night and told her that the wrong people were arrested and that a detective Brown was working for the bad guys and trying to help defendant. She believed that Pechous knew she and her group were guilty. Pechous testified for the State that he did not know a detective Brown, denied going to DeCicco's cell in the middle of the night, and denied telling her that the wrong group had been arrested. Sergeant Schroeder testified that state police investigated DeCicco's accusations against the McHenry police department, and there was no finding of malfeasance by the department. Indeed, at the third trial, DeCicco testified that she fabricated the story about Pechous and her involvement in the shooting.

¶ 287 Here, the circuit court correctly found that DeCicco lacked credibility. It acknowledged that, shortly after the murder, DeCicco made statements to her mother. However, it found that, in

her Quincy interview in 2005, DeCicco's version of the murder differed in many details from Pardo's. The court correctly noted that the date she ascribed to the murder was incorrect, and it further noted that she asserted that Levand fired the gun over his shoulder as he ran away from Briseno and that Levand told her the guy threw a knife at him. Above, we rejected her assertion that Levand fired the gun over his shoulder as he ran away. As to the throwing of the knife, it was found near Briseno's body outside the restaurant, thus, casting doubt on an assertion that Briseno threw it at someone in the restaurant. The court further noted that Pardo identified a white car, and McMullen's vehicle was white, whereas DeCicco's was silver. Another factor that the court considered in assessing DeCicco's credibility was that Pardo stated that Briseno talked to "them" in the car, whereas DeCicco stated that she *alone* was the person that Briseno spoke to during the crime and that this information was not public. As for her account that Levand pistol-whipped Briseno, DeCicco made this statement years after some of the trials in this case. Further, as the State notes, Houghtaling's account allows an inference that defendant had the opportunity to pistol-whip Briseno right before he fled, where Houghtaling testified at McMullen's trial that, as he fled the scene, he saw defendant standing over Briseno with gun in his hand.

¶ 288 DeCicco was also inconsistent about when she saw the Brummett gun, as the circuit court correctly found. She stated in 2005 that she first saw the gun, which was a revolver, when Levand and Hiland were fumbling around in her trunk, and she told them to put it back in the house. However, in 2006, she stated that she did not see the gun when Levand and Hiland were looking through her car's trunk, but, when she saw it near the restaurant, knew for certain it was in the trunk. In 2006, she claimed she saw the gun twice: when Levand and Hiland entered the restaurant and when Levand ran toward her car.

¶ 289                              3. Perpetrators' Height Differences

¶ 290   Next, defendant argues that the circuit court erred in ignoring evidence that the perpetrators had a six-to-eight-inch height difference.  Pardo, he notes, stated that the shooter was six to eight inches taller than his accomplice.  Defendant, however, was the same height as Houghtaling.  He argues that the height difference was strong evidence of innocence that the court did not appear to consider.

¶ 291   We reject this argument and refuse to speculate that the court did not at least implicitly consider the height evidence.  We also note that the evidence was inconsistent.  Pardo provided varying height estimations.  The sketch artist noted from Pardo's description that defendant was 5 feet 9 inches tall and that the man in the green jacket was 5 feet 5 inches tall, a resulting 4-inch height difference, not 6 or 8 inches.  Lieutenant Wigman, an experienced law enforcement officer, saw defendant and Houghtaling at the McHenry police department, and he observed defendant to be taller than Houghtaling by about two inches.  Defendant testified that he is 5 feet 7 inches tall and that he and Houghtaling are the same height.  Finally, in light of the other evidence pointing to defendant and his group, we disagree with defendant that the height difference was strong evidence of his innocence.

¶ 292      4. Evidence that DeCicco's Group Fled and Defendant's Group Did Not Flee

¶ 293   Defendant asserts that the court erred in not properly considering the actions of the two groups as further evidence of defendant's innocence.  He notes that, after the crime, the DeCicco group fled to Levand's grandmother's house, where they burned their clothing to hide the evidence.  Further, in June 2001, shortly after defendant's arrest, DeCicco's car was discovered, having been destroyed by fire.  On the other hand, defendant's group remained in McHenry at Weisenberger's house all night after the murder, with McMullen's car unhidden in the driveway.  The following morning, defendant stayed in McHenry, and Houghtaling wore his green jacket to

the police station the day after the murder. Also, McMullen drove her car to the police station two days after the murder; no physical evidence linked her car to the murder. Defendant contends that the circuit court ignored evidence of the DeCicco group's flight and additional attempts to destroy evidence, as well as defendant's group's refusal to hide.

¶ 294   This argument is unavailing. The evidence reflected that *both* groups stayed either in or near McHenry. DeCicco testified that her group went to Levand's grandmother's house that was apparently in McHenry (as the record is not entirely clear), Ben DeCicco's house (where DeCicco lived) in McHenry near the Burrito Express, and the Brummett house in Johnsburg (which is near McHenry). Further, as to DeCicco's car, there was a lack of evidence concerning the circumstances of its destruction that could support defendant's theory of the case. Thus, the circuit court did not err in considering the actions of both groups after the murder.

¶ 295                    5. DeCicco Group's Confessions

¶ 296   Defendant next argues that the circuit court erred by not crediting the DeCicco group's numerous and consistent confessions or meaningfully addressing them in its decision. The consistent, corroborated, and self-incriminating confessions, he asserts, were sufficient to prove his innocence.

¶ 297   We reject defendant's argument. Again, the group consisted of DeCicco, Levand, and Hiland. Levand denied involvement in the murder. The court specifically addressed DeCicco's credibility and noted that Hiland confessed to Elizabeth Schwartz, McCauley, and Trumble, none of whom contacted the police. The court also related the substance of Trumble's testimony about Hiland at the certificate-of-innocence hearing. Finally, the court addressed Hiland's meeting with an attorney, and explicitly found that Hiland's statements, along with other evidence, were

outweighed by the evidence implicating defendant's group. Accordingly, we reject defendant's argument that the court did not meaningfully address DeCicco's and Hiland's confessions.

¶ 298       6. Reliance on McMullen's and Collett's Inculpatory Statements

¶ 299   Next, defendant argues that the circuit court found that the implausible or since-recanted statements of defendant's co-defendants placed defendant at the crime scene. He asserts that this was erroneous because McMullen's and Collett's accounts are impractical and conflict not only with Pardo's account but also with the physical evidence and each other.

¶ 300   Addressing McMullen, who was the first of his group to be convicted, defendant argues that her 2001 confession is riddled with errors, including that she did not know any gunshots were fired or whether anyone was injured. She also stated that Houghtaling had a cut on his face. McMullen further stated that defendant, Houghtaling, and Collett left to commit the robbery, whereas Pardo testified that there were only two perpetrators. She also stated that she saw two people fighting in the parking lot before Houghtaling and defendant ran across Third Street and before she heard any gunshots fired. However, Pardo stated there was no fighting with the perpetrators until after they crossed Third Street, a gunshot was fired, and he grabbed the guy with the green jacket.

¶ 301   Addressing Collett, defendant argues that his stories were similarly unbelievable and differed substantially from Pardo's account. Conceding that the circuit court acknowledged that Collett provided two different versions about how he arrived at Cloud 9, the court, he asserts, did not explain how either of Collett's versions were plausible. Defendant first references detective Brogan's May 31, 2001, *grand jury* testimony, relating one version of the events that Collett gave, wherein Collett told Brogan that he walked behind the Burrito Express and heard gunshots and walked back to McMullen's car and saw defendant and Houghtaling in the car. Defendant also

references Collett's testimony at the 2003 trial, wherein he stated that, instead of walking back to McMullen's car, he walked to Cloud 9, after which defendant and his group picked him up and drove to Weisenberger's house. Addressing this version, defendant asserts that it was implausible because Collett was unfamiliar with McHenry, did not know the route to Cloud 9, and the remainder of the group would have had to know where he was going. Next, referencing Collett's testimony at defendant's 2012 trial, defendant argues that Collett admitted that he did not tell the rest of defendant's group that he was going to Cloud 9, but they were parked outside when he exited the store. This version, defendant further asserts, conflicts with Houghtaling's and McMullen's statements that Collett got back into McMullen's car near the Burrito Express, after the crime was committed.

¶ 302 We reject defendant's arguments. Contrary to his assertion, McMullen told police in 2001 that, after the three men exited her car, she heard yelling and shots fired, then more shots before they returned to her vehicle. She also did not have a clear view of the incident. McMullen stated that defendant said that he they shot someone and saw Houghtaling run behind her car during the altercation. As to McMullen, the circuit court noted the circumstances of her statements, including her 2007 interview (and that she was under sentence at the time), which included her denial that defendant's group went to Cloud 9, her statement that she gave her keys to Collett and Weisenberger so they could get beer (allowing an inference that Collett went to Cloud 9), and her statement that defendant threatened her over the phone days after the shooting. The court also noted McMullen's 2001 confession, where she corrected an earlier statement about going to Cloud 9 (*i.e.*, appearing to acknowledge the group went there). Finally, the court noted McMullen's 2021 interview (after the federal district court had granted defendant's *habeas* petition), wherein she claimed she had given a false statement in 2001. As the foregoing reflects, her statements

implicating defendant's group were not as riddled with errors as defendant suggests, and the circuit court reasonably took into consideration the circumstances under which she gave her statements.

¶ 303   As to Collett, we cannot disagree with the circuit court's resolution of the evidence.  We reject defendant's suggestion that Collett did not know where Cloud 9 was located and just happened to find it.  He testified in 2003 that the group discussed the store after it had opened and had driven past it at some point.  In 2012, he testified that he did not ask the group to pick him up from Cloud 9, but they likely assumed he was there since he was not at Weisenberger's house, allowing an inference again that the group was familiar with the store.  Further, in her 2001 confession, McMullen's statements allowed an inference that Collett went to Cloud 9.  And Houghtaling testified at McMullen's trial that McMullen suggested they go to Cloud 9 to establish an alibi (and had told police in Omaha, without suggestion, that only Collett went inside Cloud 9).  Thus, we reject defendant's argument that Collett's second story conflicts with both Houghtaling's and McMullen's statements that Collett got back into McMullen's car the Burrito Express, after the crime was committed.

¶ 304        F. Defendant Failed to Meet His Burden to Establish His Innocence

¶ 305   In summary, under either standard of review, the circuit court did not err in denying defendant's petition for a certificate of innocence.  Specifically, as to the only issue on appeal— whether defendant proved his innocence of the charged offenses by a preponderance of the evidence—the court's determination was not unreasonable.  The circuit court thoroughly detailed the evidence in the voluminous record in this case, acknowledged the strength and weakness of that evidence, and considered the competing theories of the case.  It reasonably relied on the sketches produced from Pardo's description of the shooter and the man in the green jacket and their resemblances to defendant and Houghtaling.  It also reasonably discounted the DeCicco

group's statements, which were rife with inconsistencies and/or lacked credibility. The court further noted that defendant incorrectly testified at the hearing on his petition that he rejected a plea deal after the first remand, where, in fact, the *trial court* rejected the plea agreement (finding the facts supported first degree murder, not second, and later denying defendant's motion to reconsider and compel specific performance of the plea agreement and the State's motion to reconsider). It reasonably determined that defendant did not meet his burden to show that he was entitled to a certificate of innocence.

¶ 306                                    III. CONCLUSION

¶ 307   For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 308   Affirmed.